PENNSYLVANIA COMPANY, a corporation of the Commonwealth
of Pennsylvania,
Plaintiff,

*vs.*

WILMINGTON TRUST COMPANY, a corporation of the State of
Delaware, and J. RUSSEL COULTER, Trustees under the Will of
George P. McNear, Jr., deceased,
Defendants Third-Party Plaintiffs,

*vs.*

ELIZABETH M. McNEAR, ET AL.,
Third-Party Defendants.

*New Castle, December 12, 1962.*

*John J. Morris, Jr.,* of Morris, James, Hitchens & Williams, Wilmington, for plaintiff.

*Aaron Finger,* of Richards, Layton & Finger, Wilmington, for defendant, Wilmington Trust Co., Trustee.

*Samuel R. Russell,* of Morford, Young & Conaway, Wilmington, and *Philip W. Tone,* of Thompson, Raymond, Mayer & Jenner, Chicago, Ill., for defendant, J. Russel Coulter, Successor Trustee.

*Clair John Killoran,* of Killoran & VanBrunt, Wilmington, and *Stuart S. Ball, Richard J. Flynn and James G. Archer,* of Sidley, Austin, Burgess & Smith, Chicago, Ill., for adult third-party defendants.

*David Snellenburg II,* of Killoran & Van Brunt, Wilmington, Guardian ad litem for minor third-party defendants.

SEITZ, Chancellor: One George McNear died testate in 1947, and under the terms of his will he created trusts for the benefit of his wife, their children, his three sisters and brother, and their children ("beneficiaries"). The Wilmington Trust Company ("Trust Company"), Central Hanover Bank and Trust Company (which declined to serve), and Guy A. Gladson ("Gladson") were named as trustees. The testator provided that the Trust Company was authorized to take

any action upon receipt of consent in writing from the co-trustees. He also authorized a private sale of assets. While the trust estate was subsequently divided into a series of separate trusts, for convenience they will hereafter be referred to as a single unit.

The estate's principal asset consisted of 82% of the outstanding shares of common stock of the Toledo, Peoria & Western Railroad ("TP & W"). Before naming the Trust Company as trustee in his will, Mr. McNear asked and received assurances from it that it would be both able and willing to retain the stock as part of the trust estate.

On March 10, 1952, the Trust Company and Gladson began serving as trustees. Before qualifying as trustee the Trust Company was asked again by the beneficiaries if it would feel free to retain the TP & W stock, and the same assurances were given to them.

In the period from March 1947 to May 1954, the TP & W under the executive management of J. Russel Coulter ("Coulter") made considerable progress. The Trust Company performed its duties during this period, *i.e.,* prior to the transaction involved in this action, through J. Sellers Bancroft ("Bancroft"), one of its vice-presidents. Bancroft served as a director of the TP & W. He was seceretary for a time and later its vice-president.

There subsequently took place a series of events concerning the sale of the TP & W stock which, because of their importance in resolving the ultimate issues presented in this controversy, are discussed hereafter in some detail. The outcome of these events was that on April 15, 1955, agents of the Trust Company signed papers by which they accepted offers of the Pennsylvania Company ("Pennsylvania" or "plaintiff"), a wholly owned subsidiary by the Pennsylvania Railroad Company, and the Atcheson, Topeka & Santa Fe Railroad Company ("Santa Fe") to purchase 23,400 shares, or 26%, each of the total number of shares outstanding of the TP & W stock at $100 per share, subject to certain conditions and the understanding "that all necessary details to implement this [agreement] will be worked out by our respective Counsel". Before an implementing agreement was executed, the trustees received an offer from one Ben Heineman

("Heineman") in behalf of the Minneapolis & St. Louis Railway Company ("M & St. L") to purchase all the stock held by the trustees for a price of $133.33 per share. Reference to "Heineman" herein will be deemed to indicate actions taken in behalf of the M & St. L. The co-trustees after some delay adopted the position, on the advice of counsel, that they had no binding commitment to the Pennsylvania and the Santa Fe and so advised them. The trustees also advised them that they intended to sell all the stock to Heineman unless they increased their offer and fixed a deadline for acceptance. Pennsylvania made no further offer, contending that it had a binding agreement with the trustees. Santa Fe offered to pay $135 per share for all of the stock. The trustees accepted the Santa Fe offer and the sale was consummated.

Thereafter, Pennsylvania instituted this action against the trustees seeking specific performance of its alleged binding agreement of. April 15, 1955, or, in the alternative, monetary damages. The Trust Company filed a third-party complaint against the trust beneficiaries seeking in effect to be exonerated from liability on this original claim. Coulter, who became successor trustee to Gladson after the events herein involved, filed a cross-claim against the Trust Company, and the third-party defendants, the beneficiaries, filed a counterclaim against the Trust Company seeking to surcharge the Trust Company for the amount of any claim which might be established by the original plaintiff, Pennsylvania. Subsequently, cross-motions for summary judgment by the plaintiff and the Trust Company were denied, and this decision was affirmed on appeal. See *Wilmington Trust Company v. Pennsylvania Company*, 39 Del.Ch. 453, 166 A.2d 726, aff'd, *supra* p. 1, 172 A.2d 63. Thereafter, and before trial, the Trust Company and Coulter as co-trustees settled with Pennsylvania by paying $500,000 from the assets of the trust. The court approved stipulation concerning that settlement provided in part that it was without prejudice to the pending cross-claim and counterclaim.

Thereafter the cross-claim of the co-trustee and the counterclaim of the beneficiaries came on for trial. This is the decision on the request of the beneficiaries of the McNear testamentary trusts and of

Coulter, the present individual co-trustee, that the other co-trustee, the Trust Company, be surcharged for the full amount of the settlement sum paid from the trust assets to Pennsylvania. Reference herein to the contentions of the benefieciaries will be understood to embrace those made by Coulter.

I pause to note that it appears to have been tacitly agreed by the parties that Gladson, co-trustee with the Trust Company at the time of the transaction herein involved, was in no condition at the date of the trial (1962) to testify meaningfully concerning the facts.

The facts are these: On April 15, 1955, the Trust Company for itself and its co-trustee entered into written agreements with the Santa Fe and the Pennsylvania to "sell" the latter 26% each of the outstanding common stock of the TP & W from the trust estate. The trust would thus retain 30% of the outstanding stock. Parenthetically, as noted before, the question later raised by Pennsylvania in this action was whether these agreements became binding before being implemented by the execution of a final written agreement. It is important to note that even if the April 15 agreements were intended to be binding before the execution of this implementing agreement, it is nevertheless tacitly conceded that such agreements were not binding between the parties thereto prior to approval by the respective boards of the purchasing railroads, as stipulated in the agreements themselves, and prior to receipt of the written consent of the individual co-trustee, as specifically required under the will of George P. McNear. Admittedly, both these requirements were ultimately satisfied, but the question here posed is whether the Trust Company was guilty of a breach of trust either before April 15 or thereafter, first in negotiating the written agreements with the Santa Fe and the Pennsylvania and then in not withdrawing therefrom prior to the time when there could have been no claim that the April 15 agreements were legally binding, viz., prior to April 27 when the Pennsylvania board voted its approval of these agreements. The substance of the beneficiaries' claim is that the Trust Company allowed the trust estate to become "bound" by the April 15 agreements at a time when it could have dealt with Heineman at a higher price.

The shares of stock held by the trust had assumed a unique value by April 1955, and that fact was unmistakably clear both to the trustees and to each of the prospective buyers. The TP & W is known in the railroad industry as a "bridge carrier", *i.e.,* most of the traffic over its rails neither originates nor terminates on its own line. Its principal traffic feeders in 1955 were the Santa Fe on the west and the Pennsylvania on the east. The record indicates that both these railroads had their own tracks which together in effect paralleled those of the TP & W running east and west across the mid-western part of the United States. Each of these roads solicited traffic to run over its own lines, and it appears that in most instances individual shippers determined the route that their goods ultimately traveled. All of these railroads are connected by interchanges so that goods may flow part of the way on one road and then shift to, and continue upon, another.

The special value of the TP & W in 1955 arose from the following facts: In 1954, Heineman succeeded to the management of the M & St. L. He thereafter sought to acquire control of both the Monon and TP & W railroads in order to accomplish a particular purpose. A substantial portion of the east-west railroad traffic in the United States is routed through the Chicago and the St. Louis "gateways". Heineman believed that this situation resulted in undue congestion and losses in shipping time. He therefore proposed to link together the M & St. L, the Monon, and the TP & W in order to bypass the then principal gateways and to create a major interchange at Effner, Indiana—the eastern terminus of the main line of the TP & W. If the plan of acquisition had succeeded, it was possible that the position of the other railroads engaged in the east-west shipment of goods would have been seriously threatened.

Heineman's intention to acquire the TP & W was well-known in the railroad industry, because in 1954, the M & St. L's failure to do so had been an issue in the proxy fight that led to Heineman's acquisition of control of the M & St. L. Nevertheless, the full scope of Heineman's so-called "outer-outer belt" plan does not seem to have been appreciated at that time. The reason perhaps is that acquisition of the Monon link was undertaken covertly through the purchase of

voting trust certificates which were later to be converted into common shares. The record indicates that until March of 1955 the M & St. L in the person of Heineman was the only active and persistent bidder for the shares of the TP & W. This is consistent with the fact that until March neither the Santa Fe nor the Pennsylvania indicated any concern with Heineman's outer-outer belt plan, and it may reasonably be concluded from this record that they had no information until that time of the extent of his efforts, except perhaps as to the TP & W. On March 16, Mr. Gurley, president of the Santa Fe, told Bancroft, representing the Trust Company, that the Santa Fe did not want the TP & W to fall into "unfriendly hands". He then referred specifically to the M & St. L. As early as January, Bancroft had learned of the Santa Fe's interest in the TP & W and also of the Rock Island's opposition to an acquisition of the TP & W by the M & St. L, but neither of these parties made a definite move to acquire the TP & W until March. Thereafter, however, events were to move very swiftly, culminating finally in the April 15 agreements whereby the TP & W was "sold" to the Pennsylvania and Santa Fe.

I find it clearly established on the record that the Trust Company by the end of March 1955, appreciated the real interest of the M & St. L in acquiring the TP & W as part of a systematic plan and knew moreover that the interest of other railroads lay principally in preventing such acquisition. I am faced then with the question whether the course of conduct adopted by the Trust Company in negotiating the sale to the Pennsylvania and the Santa Fe and in placing the trust estate in a position where it was required to compromise a claim against it based on one of those agreements complied with the legal standards applicable to trustees.

The legal test to be applied here is set forth in 12 *Del.C.* § 3302:

"In * * * selling * * * property for the benefit of another, fiduciaries shall exercise the judgment and care under the circumstances then prevailing, which men of prudence, discretion and intelligence exercise in the management of their own affairs * * *."

■ Did the Trust Company exercise such "judgment and care under the circumstances" as the statute requires? When a trustee endeavors to sell the assets of a trust estate, his principal object is to obtain the maximum price, with due regard for the value of the asset involved. It is at least generally true that the trustee should do his best to secure competitive bidding and to surround the sale with such other factors as will tend to cause the property to sell to the greatest advantage. *Bogert, Trusts and Trustees, (2nd ed.)*, § 745, p. 610; *Buttle v. Saunders,* [1950] 2 *All Eng. L.Rep.* 193.

■■ The statute of course requires something more than an honest opinion or good faith business judgment on the part of the trustee. The statute contemplates that the trustee will act as other reasonable businessmen would have acted under the same circumstances. The trustee's conduct is not excused because of his personal preferences or particular methods of doing business if men of "prudence, discretion and intelligence" would have acted otherwise.

I assume that the burden of proof on the issue of negligence rests with the persons asserting the claim. *Neely v. People's Bank of Anderson,* 133 *S.C.* 43, 130 *S.E.* 550; *In re Lerch's Estate,* 399 *Pa.* 59, 159 *A.2d* 506; *In re Hubbell's Will, Sur.,* 90 *N.Y.S.2d* 74. And Delaware authority, *In re Mills' Will,* 26 *Del.Ch.* 203, 26 *A.2d* 241, is not inconsistent with the usual rule. In so assuming I do not reach the question as to whether the rule is different where it is established that the trustee refused to accept what was apparently the highest offer for the property.

The record indicates that active consideration of a sale of the stock commenced only in 1954 when Heineman made the first of two offers in that year to buy the shares. In June 1954, Heineman made an unsolicited offer to buy 100% of the outstanding stock for a sum of $6,260,000 or about $69.50 per share. This offer was on the basis of $7\frac{1}{2}$ times 1953 earnings—well in excess of the price-earnings ratios of other railroad stocks which might be considered comparable. It was higher than the amount previously received for certain shares of the stock which had been liquidated to settle the estate.

The circumstances under which this offer was rejected will serve to clarify many of the events that followed. It is evident that in 1954 the co-trustees, the Trust Company and Gladson, were in general agreement about the procedure to be adopted in negotiating a sale. Agreement was imperative from the Trust Company's point of view, since Gladson under the terms of the will had to give express written consent to any action taken with respect to the trust estate. The policy agreed upon was that the trustees would not enter actively into negotiations looking toward a sale nor would they haggle over price. They were willing to consider any offer made to them and if sufficient, would sell the stock, but they would not pursue the buyer. The trustees at this time were in collective agreement (1) that any active negotiations to sell the shares would adversely affect the morale of the railroad's officers and employees and (2) that certain members of the testator's famliy who were trust beneficiaries would be distressed if they learned that a sale of the railroad was contemplated. The trustees, however, were not required by the will to consult with the beneficiaries with regard to any disposition of the trust property.

The trustees seem to have agreed generally that diversification of the trust assets was desirable. After the testator's death, the TP & W had enjoyed considerable progress under the management of Coulter. Thus, the trustees while aware of the desirability of ultimately selling the stock made exceedingly slow haste in that direction. Admittedly, before Heineman's first offer in June 1954, no effort had been made to appraise the TP & W or to interest potential buyers. The record does not indicate that there had been any previous offers to buy the TP & W stock.

Who were the persons interested in the ownership, management, or control of the railroad in 1954? First, there were the trustees both corporate and individual. The Trust Company was represented in the relevant transactions either by Joseph W. Chinn ("Chinn"), then its vice president and principal trust officer and a law school graduate, or by Bancroft, who carried out the active duties of the trust through service as a director of the TP & W and as a member of its executive committee. Bancroft had contact with some of the bene-

ficiaries of the trust as well. Gladson, the individual co-trustee at the time, was described in the testator's will as "my friend". He too served on the TP & W's board of directors and was a member as well of the law firm that represented the TP & W. In June of 1954, Gladson was apparently an equal partner in the administration of the trust. Heineman's initial offer was in fact directed to Gladson, who contacted Bancroft and advised him that he was going to reject it. On Bancroft's advice, before any reply was sent to Heineman, the beneficiaries were consulted in order to probe their attitudes. Their reactions were mixed. Gladson, therefore, pursuant to the policy described above, which was thereafter formulated in a series of letters between himself and Bancroft, rejected the offer.

The beneficiaries under the trust may conveniently be divided into two groups: (1) Mrs. McNear, widow of the testator, together with her immediate family and (2) the so-called "California bene-ficiaries", each of whom was a relative of George P. McNear. Mrs. McNear had a one-half interest in the income of the trust and her children one-fourth. On the deaths of these respective income bene-ficiaries, their descendants were entitled to the principal in the same proportions. The final one-fourth had been given to the testator's sisters and brother and their descendants. Beginning in June 1954, upon receipt of Heineman's initial offer, the trustees intermittently contacted various beneficiaries with respect to the possibility of sale. Mrs. McNear, who spoke for her children as well as herself, con-sistently opposed any sale because of her personal attachment to the TP & W. Nevertheless, she realized that some diversification of trust assets might realistically be necessary, and ultimately she was instrumental in obtaining a valuation of the TP & W for her own use. The Trust Company was aware of her attitudes. The California beneficiaries, each having a proportionately smaller interest in the trust property, looked with more favor on a sale of the stock. They were interested primarily in obtaining the most advantageous terms.

Actual management of the TP & W rested with Coulter. In the early part of the negotiations leading toward sale of the stock Coulter does not seem to have played a significant role. Subsequently, he

became a substantial participant in the efforts to conclude the transaction. It does not appear that his advice was sought at all with regard to the June 1954 offer. The board of directors of the TP & W at that time consisted, in part, of Bancroft and Gladson representing the trustees, Coulter, the then president, and Mr. Henry Kelley representing the stock interests of the Central Hanover Bank. It is apparent that none of the directors other than Coulter actively managed the business. As noted, the directors feared, at least in the early stages of the negotiations, that reports of continuing efforts to sell would adversely affect the morale of the executive employees of the TP & W. This fear derived from Heineman's public disclosures of his intention to acquire the railroad for the M & St. L and then to effect economies in its operation. The trustees were concerned with preventing losses in management personnel in the event that no satisfactory arrangment could be reached with Heineman and they were then left holding the stock.

Heineman, the prime mover in the early part of the negotiations, was in constant communication with the trustees either by personal letter or through former Judge Hugh M. Morris, a Wilmington attorney. Heineman was troubled by the trustees' refusal to suggest a price, or range of prices, with regard to which he could make an offer. They likewise would not state that the railroad was not for sale under any circumstances. On July 27, 1954, Chinn was informed that Heineman had offered to pay one-half the expenses of an appraisal of the TP & W's assets. Chinn set forth the position of the Trust Company in the following contemporaneous memorandum to Bancroft:

"* * * I repeated to Judge Morris what I told him over the telephone yesterday, in your presence, that the Toledo, Peoria & Western Railway Company is not for sale; that we, as trustee, however, would feel obliged to consider any bona fide offer to purchase the Road, and if the offer should appear to us to be attractive we would, at our own expense, determine what appraisal, if any, would be necessary, and that in order for us even to consider an offer attractive it would have to be substantially more than Mr. Heineman's original offer of $6,240,000 [sic].

"I told him we are not in a position to indicate what we mean by substantial, and are not willing to enter into any negotiations for the sale of the Road unless and until we receive an offer that we feel merits our serious consideration, and that if Mr. Heineman cares to do so he should indicate to us the top figure he would be willing to pay for the Road, and we will then determine whether or not it is sufficiently attractive to justify our giving consideration to the same."

Bancroft later testified that at that time the Trust Company's representatives did not know what price would be "adequate". Gladson, the co-trustee, was informed of the posture adopted and replied,

"* * * I am particularly glad that Joe told him that the Toledo, Peoria & Western is not for sale, because I understand that Heineman has stated publicly that the road is for sale, and that he expects to acquire it. I know nothing that would ruin the morale of the employees of the road quicker than that there was to be a change of management. * * *"

On September 23, 1954, Heineman made his second offer to buy the outstanding shares of the TP & W. This time he offered $7,250,000 for 100% of the stock, which brought the price per share from $69.50 to $80.55. Heineman also offered to buy the 82% held by the trustees at the same per share price. The agreement in either event would be subject to approval by the I.C.C. and the stockholders of the M & St. L. Heineman again offered to meet with the trustees at a convenient time and place in order to discuss details.

The reply to this offer was in substance the same as that given to the earlier one. Heineman was informed by a letter dated October 11, 1954, that his offer was unacceptable. Before the reply was sent, however, all the interested persons were again contacted to ascertain their sentiments. A fair summary would be that no person had substantially altered his previously-held opinion. Gladson and Mrs. McNear continued to oppose a sale, but for reasons which were largely

personal to themselves. Gladson apparently felt a certain amount of animosity toward Heineman from causes wholly unrelated to the sale of the stock. Mrs. McNear on the other hand was deeply attached to the railroad, which her husband had developed, and ultimately suggested that her share of the income of the trust be used to acquire the shares of stock accruing to the other beneficiaries in order to forestall a sale. The immediate cause for her alarm was a letter sent to Gladson by the son of one of the testator's sisters recommending a sale at $100 per share.

In the face of these conflicting attitudes the Trust Company took no further steps. Mrs. McNear was advised that though the offer appeared "statistically favorable", it would be rejected. The Trust Company, however, reserved the right to re-examine the matter in the light of changing circumstances. Two suggestions had arisen from within the Trust Company itself, but neither was apparently acted upon. First, there was some sentiment for making a counter-offer in order to obtain a price in excess of $80.55. Secondly, it was thought that the Pennsylvania and the Santa Fe railroads should be contacted to ascertain their interest in acquisition of the stock. The Trust Company took no such action. Instead it acquiesced in the terse reply sent by Gladson. The Trust Company took no action at that time to obtain the appraisal which it had promised Heineman it would make in the event that it received a favorable offer.

Heineman's second offer had provoked a series of communications between the trustees and beneficiaries which ultimately led to a rejection of that offer. Heineman was not dissuaded, however, since he had specifically been advised through Judge Morris that a suitable offer would still be considered. He therefore resumed contact with the trustees and also sought to approach the beneficiaries directly. The reason for this new tack is explained by this memorandum from Chinn to Bancroft dated October 14, 1954:

> "I told Judge Morris that we could only repeat what we had previously said, that the Railroad was not for sale, but that we would carefully consider any offer made to us. I told him also

that we felt that it was most appropriate to ascertain the feelings of the principal beneficiaries of the trust, even though the ultimate decision is up to the trustees, and that so far as the beneficiaries are concerned, there still is a considerable difference between Mr. Heineman's offer and what they consider to be the value of the Railroad."

Further in the same memorandum Chinn also said:

"I told Judge Morris that we are not in a position to indicate a price or enter into any negotiations for the sale of the Railroad since we feel this would be extremely detrimental to the morale of the employees of the Road."

Heineman therefore was led to believe that there were two hurdles to be overcome in purchasing the TP & W stock. First was the reluctance of the trustees to enter into negotiations of any kind, and second the apparent dissatisfaction of the beneficiaries with the price that had been offered.

The Trust Company then learned indirectly that Heineman was seeking to communicate personally with the beneficiaries. The Trust Company's representatives doubted that anything would be accomplished by such meetings and therefore did not encourage them. These officials met together on October 29 and decided that since Heineman was bent on interviewing the beneficiaries, the stock should be offered to him on a "take it or leave it" basis at $100 per share. The only support for such a figure admittedly was the letter from the son of one of the California beneficiaries, but $100 was substantially in excess of Heineman's previous high of $80.55. No appraisal had as yet been made of the TP & W's assets. When Gladson was informed of this decision, his first reaction was to seek competitive bids, but Bancroft suggested that by assuming such a posture, the trustees would be admitting that the TP & W was for sale. Gladson considered the matter and advised Bancroft not only that competitive bidding should be avoided, but also that no offer should be made, since a refusal by Heineman at $100 would set a ceiling on the price. The

upshot of this activity was that matters remained much as they had been before. The Trust Company offcials had previously agreed that if Gladson refused to go along with the proposed offer to Heineman at $100, they would "do nothing further". It does not appear in the record that Heineman succeeded in meeting with the beneficiaries at this time.

Heineman during November and December of 1954 continued to urge the trustees either to set a price or to commence negotiations. On November 18, Bancroft learned that there was another prospective purchaser in the field who was interested in the stock at $90 to $100 per share. Bancroft also knew that Heineman was somewhat piqued at the treatment he had received in his efforts to buy the stock. He had hinted that there were other alternative prospects available to the M & St. L. On December 28, Heineman sent Bancroft a letter in which he summarized his dealings with the trustees and offered to increase his previous bid:

> "* * * This will advise you formally that subject to necessary corporate and Commission approval, and for a limited period of time, we are prepared to buy for cash at a price higher than our last offer, all of the capital stock of the TP & W now held by you as Trustees. In view of the fact that we have made two substantial offers without receiving any indication from the Trustees of the price which they would accept, we are not prepared to make specific the higher price that we are prepared to pay unless and until we receive an indication from the Trustees of a price, or range of prices, which they would accept.

> "If within a reasonable time the Trustees have not arranged a meeting with us for the purpose of discussing such a price, we shall assume that the shares of stock of the TP & W now held by the Trustee are not for sale at any price."

Another round of letters followed Heineman's letter of December 28, with the result that no action was taken on his request for a meeting with the trustees until March. In the meantime the circumstances surrounding the potential sale were undergoing a change. At

an executive committee meeting of the TP & W on January 12, Bancroft was informed that both Coulter and Gladson had discussed the possibility of sale with Gurley, president of the Santa Fe. Gladson's encounter had apparently taken place in the previous October or November. Gladson reported that he had given Gurley no more information than had been given to Heineman. At the same meeting Bancroft also learned of the opinions with regard to a sale of a Mr. Sherritt, of the Rock Island, of Mr. Symes of the Pennsylvania, and of Kelley, who represented the Hanover Bank. I set these out below as they appear in Bancroft's memorandum of that meeting:

> "* * * Mr. Sheritt told Mr. Kelley that he would buy the Hanover Bank's 15% stock interest in the TP & W, would pay more than the $80 bid by Heineman, but indicated he would not pay $100 per share. No one seemed to know why he would be interested in the TP & W stock.

> "The Rock Island is very much opposed to the Minneapolis & St. Louis acquiring the TP & W which would indicate that the Rock Island would pay a good amount rather than see the Minneapolis & St. Louis come into control.

> "Mr. Coulter saw Mr. Symes, President of The Pennsylvania Railroad, about three weeks ago and Mr. Symes indicated that there was no advantage in the Pennsylvania acquiring the TP & W."

> * * *

> "Once again Mr. Kelley said that he would approve sale of the TP & W for $10,000,000, and once again Mr. Gladson refused to commit himself in any way."

Bancroft learned that in Coulter's opinion the Santa Fe was "by far the most logical purchaser" of the TP & W, the Rock Island "the second most logical", and the M & St. L also "logical". Coulter, for reasons not disclosed, had at different times discussed the matter of sale both with Gurley and with Symes. Neither had responded in a manner which indicated a pressing concern with the disposition of the railroad. Nevertheless, the Trust Company now knew that in addi-

tion to Heineman there was an undercurrent of interest in the TP & W among other persons. On January 26, Bancroft wrote Heineman that in light of the changed circumstances, viz., the presence of other interested buyers, it was necessary to "study the whole picture very carefully before any steps are taken."

During the month of February the Trust Company's representatives supplemented their knowledge of the value of the TP & W stock with two valuations made by members of the Trust Company itself. The Turnbull report, based on a comparison of the TP & W with other "bridge" railroads, placed a valuation of $10,400,000 ($115 per share) on the stock. The Jeanes report indicated a value of $90 per share, but I find that that report contemplated a recapitalization of the TP & W and was made in connection with Mrs. McNear's suggestion that the trust estate buy out the stock interests of the California beneficiaries. Bancroft also was, or soon after became, familiar with the report compiled by W. E. Hutton & Co. at the request of Mrs. McNear. This report, dated December 31, 1954, suggested a valuation of from $7,053,750 ($78 per share) to $9,292,500 ($103 per share) "plus strategic value of connections with: Santa Fe, C. B. & Q. and Rock Island on West, Pennsylvania, N. Y. Central, C. & E. Illinois, St. Paul on East, and Chicago & North Western, M & St. L, Illinois Central, Gulf, Mobile & Ohio, N. Y. Chicago & St. Louis and Illinois Terminal in Center."

What other indicators of "value" were then available to the trustees? Up to this time Heineman, in effect bidding against himself, had made an unambiguous offer to negotiate in excess of $80.55. The son of one of the California beneficiaries had recommended a sale at $100. Mr. Kelley had expressed approval of a sale of $111. Two other parties though unsolicited were rumored to be interested in the shares at less than $100. Gladson, one of the trustees, had refused to permit a counter-offer to Heineman at $100 or to enter into negotiations.

Up to this time, March 1955, the trustees had maintained the attitude which they had previously agreed upon. In the absence of

an offer which they considered sufficiently attractive, they had refused to negotiate, preferring instead to retain the shares. No independent, expert appraisal of the stock or of the assets of the TP & W had been obtained by them. They had succeeded in holding Heineman off without losing him as a bidder.

From March 4 to April 15, however, the character and tempo of the efforts to sell were to undergo a radical change. The change itself was foreshadowed in January by the apparent interest of other persons in the shares of the TP & W. During March the pressure to sell was intensified when the facts concerning Heineman's Monon purchase and his outer-outer belt scheme became publicly known. It was clear, and the Trust Company which was at the center of the negotiations knew, that none of the competing bidders intended to purchase the TP & W as an ordinary investment. All but Heineman were interested principally in stopping the M & St. L. By April the trustees because of the competitive situation that had arisen were in a position to sell the stock at most advantageous terms.

On March 4, after having received the requested valuation reports, Bancroft advised Gladson of the unanimous feeling of its concerned officials regarding the question as to whether the TP & W stock should be sold or retained:

"First of all, we are of the definite opinion that we should not attempt to get Mr. Heineman's top bid and then canvass the other railroads. We are quite sure that Mr. Heineman would not be willing to make a bid on such a basis, even though we assured him that his price would not be mentioned or indicated. Consequently, we might well cause Mr. Heineman to decide not to make any bid whatsoever.

"It is our recommendation, therefore, that each of the railroads we mentioned be called on and each be given the same story, namely, that there have been offers for the TP & W stock and indications of interest. The Trustees, as they have consistently said, do not want to sell their stock holding but they have to take cognizance of the offers and the rumors going around

that the railroad is going to be sold. It seems in order, therefore, that the Trustees try to clear up this situation for the present and the indefinite future by finding out just how much can be realized, the idea being that if the price is definitely a favorable one they should very seriously consider sale. If the price is not definitely a favorable one, there can be a final general turndown and the road should not be bothered for some time with offers and the attendant rumors. The Trustees would want to know reasonably soon of any material bid, as they do not want the present situation to continue any longer than necessary. They have not put a price on the stock as they are not trying to sell it—they are simply checking to see if it should be sold. Each railroad, of course, would be advised that other railroads are being asked about any interest which they may have.

"The above is a rough sketch of what would be said and, of course, should be refined and any other matters considered important should be added. * * *"

It was decided that the railroads to be contacted were the M & St. L, Pennsylvania, Santa Fe, and Rock Island. On March 10, Bancroft sent Gladson another letter which dealt with the same subject matter:

"Dear Guy:

"Confirming our telephone conversation this morning, we all seem to be in accord as to our visits to the various railroads. You, Henry [Kelley] and I will see each one on the general basis outlined in our letter of March 4. As I told you, I think under the circumstances we should call on Mr. Heineman first, although we will not treat him any differently than the rest."

"* * * I doubt much time will be needed for a visit, as we are not going around to negotiate in any sense of the word nor would we expect any general discussions—the purpose of each visit simply to acquaint the railroad with the present situation."

The Trust Company was notified by Heineman that the proxy material for the M & St. L's annual stockholders' meeting was to be sent out on April 15, and therefore the question of purchase by the M & St. L would have to be settled by that time.

The critical meeting was held with Heineman on March 15, 1955 in Chicago. Bancroft and Kelley were present, but Gladson declined to attend on a last-minute plea of illness. Bancroft's memorandum of the meeting purports to be a record of the conversation that occurred:

"Mr. Heineman is still very interested in the acquisition of the TP & W, but time is running out and he may have to take his second choice so he will not lose it. He said that he was sure the Minneapolis & St. Louis would pay more than the other railroad. He refused to make another bid but stated that if we decided to auction off the road he would give an upset price provided we were willing to accept it if we did not get a better offer.

"Mr. Heineman mentioned that his group had purchased working control of the Monon from two insurance companies and through market purchases. He stated very definitely, however, that the fact that the three railroads fitted well would not make him pay any more for the TP & W."

\* \* \*

"Although Mr. Heineman would not make another price, he did give an indication of the range in which he was willing to negotiate. He said that the February 28, 1955 markets of 31 railroads were 8.39 times their five-year average earnings and 8.41 times their three-year average earnings. The five-year earnings of the TP & W were exactly $9 per share, somewhat above the three-year average, the six-year average, and the seven-year average. His range would be between $9\frac{1}{2}$ times the five-year average and 11 times the five-year average, the first figure being $85.50 per share and the second figure $99 per share. \* \* \*"

The Trust Company's representatives in fact knew that Heineman was not likely to give them a final, top bid at this March 15 meeting. This was the "unanimous" opinion of these officials as expressed in the March 4 letter to Gladson. Heineman subsequently denied that he was asked to name his highest price. One understandable reason for this is that Heineman was the first of the potential buyers to be interviewed. While meeting with him first might have seemed a courtesy, since he had been the most persistent "prospect", nevertheless he was put in the position of perhaps having his offer used as a lever against the other buyers. Thus, at this meeting, the only real alternatives open to the interviewers were either to open full-scale negotiations with Heineman or to leave matters in the uncomfortable position they were in. Having chosen the latter, they can hardly argue that they reasonably believed that Heineman had made his final bid. Bancroft later testified that Heineman "said he would not give us his highest price," and Kelley confirmed this by stating that while Heineman was asked to give his highest bid, he refused to do so.

The next question then must be whether Heineman's suggesting a "range" in which he was willing to negotiate gave the interviewer reasonable cause to believe that Heineman had firmly fixed a limit beyond which he would not go. The Trust Company claims that this is so. The record is not clear what the "range" was that the parties then had under consideration. Apparently the charts, memories, and memorandums of the parties differed on this score. Also, the average earnings figures used by Heineman at the meeting were inaccurate, as Bancroft subsequently learned. In any event, the lowest "top" figure suggested by Heineman was roughly $99, and the "range" was $85.50 to $99. Bancroft testified that Heineman had said "that he would negotiate within the range but neither at the top nor at the bottom." Heineman on deposition admitted that "as a matter of negotiation strategy" he may have made that statement.

Mr. Kelley's recollection throws further light on the attitude of each of the parties:

"A. Yes. We went to the meeting. Of course Mr. Heineman knew we were coming, and I think that I spoke first. I am not sure whether I or Bancroft did. I said, 'Well, you have made'—after a few preliminaries, why, we started in with the meeting, 'You have made two offers. One for $70 a share approximately, the other one for $80, both of which have been turned down." And, as I say, I can't recall which one of them said, 'We have come here to find out. In the first place we want to get this thing over with, we want to get your best price.'

"He got very angry at that point and he said 'I think you have treated me shamefully. You don't even let me know what you want. You ignore me. I am just sick and tired of the whole thing.' He was quite angry about this thing. He said, 'I thought you fellows came over here to negotiate this thing in good faith.'

"So then he calmed down a little bit, he got out these graphs with these charts showing I don't know how many railroads, their earnings and so forth, as I recall it, for quite a while. And Bancroft and he argued. I didn't argue with him on that point, I am not a figure man. So he finally came to the conclusion or ended up by saying, 'I have taken eight times, or eleven times earnings, and I think a fair statement is to say that this stock—and this is my position—is worth—' I am going to give you '85 and 100' because that is my recollection of what he said.

"Q. Your recollection is he used the specific figures 85 and 100?

"A. That's my recollection, yes, sir. The other memorandums of his own and Bancroft used a different figure there of 85.50 and 99, I think it was. But that doesn't strike in my mind; what was in my mind was 85 to 100. And he said as I recall it that the bottom is 85, we shouldn't sell for less than that, and the top is 100 and nobody should buy it for more than 100. 'If I negotiate, I am going to negotiate in that area, neither at the top nor at the bottom.'

"So we discussed this thing for some time on a more friendly basis. I think that's about all there was to it. We told him we were going to other people; that is, to other roads.

"Q. Did he make any comments on your reporting you were going to see other people?

"A. Yes. He said, 'Well, I'm interested in the railroad.'

"Q. He said to you, didn't he, that he was prepared to pay more than anybody else would?

"A. No, he did not. He did not. He said he was interested and that he wanted us to come back if we got another offer better than his. No, he didn't say that until later, Mr. Ball, I don't believe. I think I know what you have in mind. It wasn't at that meeting."

From Kelley's testimony it is clear that Heineman did not intend irrevocably to commit himself to narrow price limits even though he stated that he was going to negotiate in the middle, rather than at the ends of the negotiable range. Heineman did not say that $85.50 and $99 were *his* range for negotiation. Instead he spoke of that range in an objective sense, as if that were the range which the trustees would necessarily have themselves proposed after considering the available data. Heineman therefore offered to negotiate in the middle of what he urged was the trustees' range. His reasons for doing so are fairly evident. He could not commit himself to a specific figure for fear that the trustees would accept a higher offer from another party. He could not suggest a "range" within which he would negotiate because this too would tend to set a limit on his offering price. Instead he adopted the third course of telling the interviewers the range in which *they* could negotiate and offering to negotiate within that range. By acting in this manner, he effectively placed the trustees in the position of having either to affirm or deny the validity of his assumption about the "range". If they were to receive an offer beyond that range, they would have to return to Heineman and explain that his previous "assumption" was incorrect.

Heineman's conduct at the March 15 meeting is thoroughly understandable in terms of his outer outer-belt scheme and his persistent effort to buy the TP & W. It was equally imperative from his point of view that on the one hand he avoid tying himself to any particular price tag and on the other that in some way he force the trustees to commit themselves. Heineman continually suggested that he understood that the trustees were required by law to sell at the most favorable price, apparently in the hope that the trustees would be shaken from their reticent attitude. He subsequently stated that it was fairly obvious to him at an early date that the trustees were going to sell.

Each of the statements attributed to Heineman in Bancroft's memorandum is consistent with Kelley's recollection of the meeting and the interpretation placed upon it. The Trust Company points out that Heineman stated at the time that his acquisition of the Monon would not cause him to pay any more for the TP & W. He also discussed the TP & W's revenues from the hauling of freight and said, moreover, that if the trustees did not give him an early response, he would purchase an undisclosed "second choice". These statements were necessitated by the position in which Heineman found himself. If he had stressed the importance of the TP & W to the M & St. L, he would only have made the trustees less willing to name a figure. Therefore he emphasized that he was a buyer like each of the other interested parties and would negotiate in what he had said was the proper range of prices for the trustees to consider. Nevertheless, Heineman did offer an upset price in the event that the trustees decided to "auction off the road" and asked them to return if they received a better offer.

While it is clear that Heineman did not intend to limit himself to a fixed price or range of prices, could the trustees reasonably believe from what Heineman had said that he did so limit himself? The answer depends of course on what the trustees knew of Heineman as a buyer and of his outer-outer belt scheme. They must have known that the conditions under which they were attempting to sell imposed an impossible burden on any anxious buyer and

that Heineman was such a buyer. Bancroft admittedly knew at the time of the March 15 meeting of Heineman's outer-outer belt plan and understood that the voting control he had obtained over the Monon was valueless without control of the TP & W. Under the circumstances the Trust Company's representative could not reasonably have believed that Heineman had fixed a firm limit either to the price or to the range of prices that he was willing to pay. Certainly, Heineman's statement that he wanted the Trust Company representatives to come back if they got a higher offer was notice that they did not have Heineman's top offer.

What conclusions can be drawn from the events occurring at the March 15 meeting? As a practical matter the Trust Company's representatives were interested in selling the stock and diversifying the trust assets. The principal problem was the method to be used in effecting a sale. Two considerations seem to have predominated in the minds of the sellers. First, that the TP & W stock had a value upon sale in excess of what might normally be expected for shares of stock and secondly, that unless there were at least two active bidders, they could never determine how high this inflated value might be. Heineman's singular interest posed a special problem in deciding upon a method of sale. Any attempt to name a price on the part of the sellers would establish an upper limit for the stock—with no assurance that the upper limit had in fact been reached. On the other hand, if the sellers did not name a price, there seemed to be a very real danger that Heineman would lose interest and conclude that the shares could not be bought. The latter method was of course the one adopted at the March 15 meeting. The results were predictable. Heineman refused to set a price, or range of prices, for reasons which have already been examined. Thus, the sellers were in effect in precisely the position they had been in before the meeting except that Heineman now threatened not to buy at all if the trustees did not respond to his offer to negotiate.

Up to this time, as Kelley indicated in his deposition, none of the other railroads had been contacted to determine what price they would offer for the shares. The sellers, including Kelley as well as

the Trust Company's representatives, thought that if these other buyers failed to offer a price within the range suggested by Heineman, much of the pressure on him to pursue the sellers would be lost. Also, the trustees might have to make good on their oft-repeated promise to Heineman that in the event they received a favorable offer from him, they would commence negotiations leading to a sale. And this in turn would raise the specter of the dangers which had previously been feared in the event that negotiations were carried on with Heineman.

I think that one may fairly conclude from this record that the Trust Company's representatives were not unwilling to sell the TP & W stock provided the price received was sufficiently high. They were cognizant of the fact that Gladson and Mrs. McNear did not like Heineman and that if they were to sell at all, the latter would prefer not selling to him. They knew that the California beneficiaries and Gladson had both in effect recommended a sale in the neighborhood of $100.00 per share; that the Trust Company had given assurances to the beneficiaries that it was in a position to retain the shares; and that Heineman himself might not offer $100.00 unless there were bidding pressures from other buyers or the trustees were to commit themselves to a specific dollar figure. Nevertheless, they also knew, and, as the implications of the outer-outer belt plan became more generally known, it was apparent, that Heineman was a most anxious prospect and would go to great lengths to obtain the stock. This was all the more certain as the determination of the Pennsylvania and Santa Fe to prevent such a sale became clear to them.

Events from March 15 to April 15 moved very swiftly, culminating in the trustees' written agreement to sell to the Pennsylvania and the Santa Fe 26% each of the outstanding stock of the TP & W from the corpus of the trust. During this period Coulter, president of the TP & W, because of his contacts with Symes and Gurley, presidents of the Pennsylvania and Santa Fe, came to play a leading role in the negotiations. Gladson was to play a significantly lesser role.

On March 15, after their meeting with Heineman, Bancroft and Kelley met with Gurley in order to ascertain the views of the Santa Fe. Gurley refused to make any offer unless the trustees had decided to sell. He advised them that the value of the TP & W would "go down" if the railroad fell into what he called 'unfriendly hands'. The interviewers refused to indicate, according to Bancroft, what price had been offered them for the stock. Kelley told Bancroft, after Gurley's apparent disinclination to bid, that the trustees and the Hanover Bank would be lucky to get $100.00 per share.

By March 18, however, Bancroft had reason to believe that significant steps were being taken by the Pennsylvania to prevent Heineman's capture of the TP & W. Coulter called Bancroft to inform him that he had learned from Symes that the latter was flying to Cleveland to meet Gurley and arrange a joint purchase with the Santa Fe. Up to this time the trustees had never formally discussed the question of sale with the Pennsylvania. On March 21, Coulter called and said that Gurley had spoken very strongly about the TP & W falling into the hands of either the Rock Island or the M & St. L. His views, however, differed from those of Mr. Symes in that he favored an acquisition by them of all rather than part of the outstanding TP & W stock. On the same day, Bancroft made arrangements for a conference with Symes on March 24. In answer to an inquiry by Judge Morris, Bancroft replied that no decision had been reached by the trustees regarding a sale of the stock and that other railroads were going to be contacted.

On March 23, Judge Morris again contacted Bancroft and re-iterated Heineman's desire for a speedy "yes" or "no" decision. Judge Morris stated that he understood that Heineman's interest in the TP & W would terminate by the middle of April. Bancroft said that the trustees as well "were interested in getting the question of sale resolved one way or the other as soon as reasonably possible."

Bancroft, Chinn, and Kelley conferred on March 24, with Symes and Bevan of the Pennsylvania at a meeting arranged by Coulter. Symes said, according to Bancroft's memorandum,

"* * * that Pennsylvania was very happy with the present situation but it would do all it could to prevent the TP & W from falling into unfriendly hands, the M & St. L being mentioned specifically. He suggested, if we were interested in selling, that The Pennsylvania acquire 26% of the stock, the Santa Fe acquire 26% of the stock, they be given first refusal on any future sales and the Company be operated independently. He was against the Santa Fe idea of 100% ownership as he said that that had not worked out when the Burlington and The Pennsylvania owned the property. Mr. Symes is going to see Mr. Gurley today and let us know promptly what their decision is with respect to majority or 100% control.

"In connection with the acquisition by unfriendly hands, Mr. Symes said that Pennsylvania would do all they could to prevent such an acquisition which, as we know from their position on the east end, could be material."

This meeting with Symes and Bevan proved to have a very marked effect on the trustees' continuing efforts to sell the stock. The trustees now had a second potential bidder and understood the circumstances which compelled each of the respective parties to press for a sale. As soon as the Pennsylvania-Santa Fe attitude was known, Bancroft contacted Coulter and Gladson. Coulter's advice did not relate to the value or price of the stock but to the desirability of sale to either of the potential buyers. The Trust Company claims that it relied heavily on his advice in these matters. Bancroft knew that under certain circumstances approval of a sale of the stock would have to be obtained by the purchaser from the I.C.C. Coulter told Bancroft that with Pennsylvania and Santa Fe opposition I.C.C. approval of a sale to the M & St. L was "by no means assured". He said that a decision one way or the other might be delayed for more than a year. Coulter also suggested that if the Pennsylvania and the Santa Fe became substantial stockholders, it would be to their advantage not to injure the TP & W competitively.

When Gladson was contacted, he too responded enthusiastically. He thought, according to one of Bancroft's memoranda, that both

groups of beneficiaries would be satisfied—Mrs. McNear, because a large interest in the railroad would be retained and the California beneficiaries, because the trust assets could at the same time be diversified. Bancroft said that he told Gladson,

> "* * * that it was most important that no word get out about the possible proposal as we undoubtedly could get a better price from the Pennsylvania and Santa Fe if the M & St. L was still in the picture. I also told him that we would have to move very fast because Mr. Heineman has indicated that we negotiate with him in the next several weeks or he will no longer have any interest in acquiring the TP & W."

It is evident from the record that the Trust Company's representatives were very enthusiastic about a possible deal with the Pennsylvania and Santa Fe. When Bancroft said "we would have to move very fast", he was clearly speaking in terms of closing a deal with those railroads. Heineman's position was to become one that Heineman himself had long feared, i.e., his persistence would become a tool by which the trustees would sell to another at a high price. The trustees made no further approach to Heineman even though, as I have found, they knew or should reasonably have known that once the other railroads were actively bidding, he could be expected to raise his bid. In fact they took active steps to prevent other persons from disclosing the fact that negotiations were being carried out with the Pennsylvania and the Santa Fe, the explanation being that they feared that Heineman would lose interest in the TP & W and thereby relieve the pressure on the other buyers.

The Trust Company's representatives met together on March 25 to discuss the Pennsylvania's proposal which they felt "had much to be said for it." The question of price apparently had not been mentioned in the conversation with Symes. At this meeting on the 25th, the representatives had the advantage of having obtained Coulter's opinion on the advisability of selling to either of the respective parties. Admittedly there were "pros" and "cons" on either side, but the balance apparently was felt to tip in favor of the Pennsylvania and Santa Fe. One of the troublesome factors was that by selling 52% of the

outstanding shares the trust would be left with a locked-in minority interest of 30%. It was unlikely that these shares would thereafter enjoy much of a market. Retention of the shares, while not without risk, might nevertheless prove beneficial if the purchasers saw fit to protect their investment in the road. The possibility existed, however, that traffic might in the future be diverted from the TP & W. It was decided by the Trust Company that the "character and standing of the two railroads" outweighed the risks of selling down to a minority. And ultimately it was agreed that protective provisions should be written into any contract to sell less than all the shares. Heineman's standing offer, it should be noted, contemplated a sale of any amount of shares in excess of 50%.

Several days later Coulter told Bancroft that Mrs. McNear had informed him that she would never approve a sale to Heineman and would appear before the I.C.C. to prevent approval of such a sale. It is not clear why Mrs. McNear contacted Coulter on this matter, nor does it appear that she then knew of the approaches made by the Pennsylvania and the Santa Fe. She had just tried without success to convince the California beneficiaries to oppose any sale of the stock.

On April 1, Coulter advised Bancroft that Symes had called him about the "tentative proposition" and to stress to him the dangers of the TP & W being in "unfriendly hands". Coulter said that he had told Symes that if he were the latter "he would move in on the matter most promptly". Both Coulter and Gladson were cautioned about discussing the pending negotiation either generally or with the beneficiaries. Coulter agreed with Bancroft that Gladson should not be involved in drawing the protective provisions to be included in a contract of sale with the Pennsylvania and the Santa Fe. When Bancroft talked with Gladson, he spoke in terms of "the price at which the shares might be offered to the Pennsylvania and Santa Fe." As noted, this was a complete reversal of the position previously adopted by the trustees in attempting to sell the shares. Apparently, the trustees had by now considered that under all the circumstances they should sell to the Pennsylvania and the Santa Fe at the best terms that could be achieved.

Coulter, after the initial meeting of Chinn, Bancroft, and Kelley with Symes and Bevan on March 24, acted as the intermediary in many of the subsequent contacts of the trustees with Symes and Gurley. However, when he was approached by Heineman or by spokesmen for other potential interests, he refused to meet with them claiming that the matter of sale was one for the trustees. While Coulter subsequently testified that he acted solely as a go-between and though the Trust Company claims that he played a much more important role, it is apparent that Coulter enjoyed substantial personal contacts with officials of the Pennsylvania and of the Santa Fe. The Trust Company was aware of this fact and ought to have considered it when evaluating advice from Coulter.

Another curious matter took place from April 1 to April 15 wholly collateral to the mainstream of events. A Mr. Sherritt and Mr. Crown were interested in buying the TP & W either for themselves or for the Rock Island. They employed a Mr. Mulligan for the purpose of carrying out negotiations, and in the course of events contact was made with Coulter, Gladson, and the Trust Company representatives. The Rock Island had in fact been putting out "feelers" since 1954, and Gurley of the Santa Fe had mentioned the Rock Island as being "unfriendly". On April 7, Mulligan met with Chinn and told him that he represented two groups of potential buyers, one who would require I.C.C. approval and one who would not. Chinn indicated that the TP & W was not for sale, but that any offer would be considered. Mulligan was told that an offer should be made promptly but that the trustees would not negotiate or name a figure at which they would sell. This is instructive in that Bancroft had already discussed with Gladson "the price at which the shares might be offered to the Pennsylvania and Santa Fe". The Rock Island group continued to make overtures as late as April 15, but never made a specific offer to buy.

On April 12, Bancroft in a letter to Bevan confirmed the arrangements made for a meeting to be held on April 15. On the same day Bancroft wrote Coulter requesting that he be notified of the necessary protective provisions by the morning of April 15. Thus, it can

reasonably be inferred that the Trust Company's representatives anticipated that they might have to sell less than all the stock.

On April 13, Coulter informed Bancroft that Heineman had called him to find out what had been done concerning a possible sale. Coulter told Bancroft that he had indicated to Heineman Gladson's personal opposition to a sale to him. Coulter also said that he had tried to prevent Mrs. McNear from reporting the course of the Pennsylvania-Santa Fe negotiations to the other beneficiaries in order to keep the transaction as quiet as possible.

On April 14, Coulter told Bancroft he had talked to Marsh, vice president of the Santa Fe, about the meeting scheduled for April 15. Marsh indicated that he was apprehensive that the trustees would try to haggle or to use the Santa Fe's offer to obtain a higher price from someone else. Coulter assured Marsh this was not so. Coulter said that Marsh was worried about who would name a price first and that he, Coulter, had mentioned figures of "95 or 98". Bancroft thought this statement was most unfortunate. Indeed, it should have suggested to the Trust Company an excessive interest on Coulter's part that the sale be made to Pennsylvania and Santa Fe. Gladson at this time, according to a memorandum of Bancroft, still anticipated a price of about $100.00 per share.

The transaction of April 15 was carried out, according to the Trust Company's witnesses, in the following manner. Chinn and Bancroft had agreed to meet Bevan and Marsh of the Pennsylvania and the Santa Fe on the 15th in Philadelphia. Before they left Wilmington, Bancroft received a call from Gladson in which he was urged not to sell the stock down to a minority position. Parenthetically, it has been noted that the Trust Company had already anticipated the possibility of having to sell down to a minority position. At the meeting itself, notwithstanding a plea by Chinn, it soon appeared that the Pennsylvania was interested in buying only 26% of the stock, together with 26% to be sold to the Santa Fe. At that point Symes, who had been informed of the difference in attitude between the negotiating parties, called Coulter who in turn called

Gladson and informed the latter of the stalemate. Gladson then called Bancroft in Philadelphia and said that he would "go along" with a sale of 52% of the stock. The "reason" for the change of attitude is nowhere explained. The Trust Company representatives then purportedly pressed once more to sell all the shares but found that the two railroads would take only 52% of the stock and at no more than $100.00 per share. The agreements were concluded on this basis, subject expressly to approval by the respective boards of the purchasing railroads and by the I.C.C., and were signed by Chinn and Bancroft on behalf of the trustees on that day. Neither of the agreements contained any of the protective provisions deemed necessary to safeguard the retained minority interest except that it was understood, according to the agreements, that the TP & W would continue as an "independent organization" and that such provisions as were necessary would subsequently be worked out by counsel.

By Monday, April 18, Bancroft had contacted Coulter, Kelley, and Mrs. McNear and communicated to them the terms of the transaction. Gladson already knew what terms were to be anticipated. None of these interested persons raised any objection to the transaction at that time except Mrs. McNear, who asked that her attorney be permitted to review the agreement of sale and any further agreements that might be entered into. Apparently, she had been told that some further agreement was contemplated. Her request was denied. Bancroft advised each of the persons he talked with that the purchasers wanted the transaction kept quiet.

Heineman's reaction to the sale was thoroughly predictable. He was furious at not having had the opportunity to offer an upset price. First, on the very day that the agreements were reached, April 15, Judge Morris had been trying to contact Chinn or Bancroft and arrange a meeting between Heineman and the trustees. This Bancroft and Chinn learned as soon as they returned from Philadelphia that evening, Friday, April 15. It does not appear that either Coulter, Kelley, or Mrs. McNear were informed of this fact when they were later contacted by Bancroft. On Monday morning, April 18, Chinn and Bancroft went to see Judge Morris and told him that an arrange-

ment had been made with regard to the disposition of the TP & W and that Heineman was "out". Judge Morris, I find, was not told at that time whether the transaction was a purchase or lease, who the other parties were, or the terms. He was instructed that full information would only be available in about one month's time. Judge Morris, under the circumstances, did not press for a meeting between the trustees and Heineman. Instead, he immediately called Heineman's office and left a message describing what had occurred. That afternoon Heineman called Judge Morris and authorized him to offer either to buy, lease, or bid competitively for the TP & W and to state that in Heineman's opinion the M & St. L would pay more than any other bidder. This message was related to Chinn and Bancroft. It was followed on the next day, Tuesday, by a detailed, formal letter in which Heineman deplored the failure to negotiate with him and offered to pay 5% more than whatever the trustees had already agreed to accept. Heineman stated that if this offer were unacceptable, he was willing to bid competitively against the other prospective parties. Chinn and Bancroft after receipt of this letter again contacted Judge Morris and repeated that there was a "deal" and that they could not meet with Heineman. By Thursday, April 21, the Trust Company learned that Heineman intended to fight the existing agreements of sale in the I.C.C. and for that purpose would attempt to have its representatives, Chinn and Bancroft, brought before the Commission to explain their conduct.

Earlier in the week, after Bancroft and Chinn had first told Judge Morris that Heineman was "out", Bancroft succeeded in communicating with Mr. Harrison Leppo, son of one of the California beneficiaries. This was Monday, April 18, before receipt of Heineman's formal letter but after he had offered to bid competitively. It does not appear that during the conversation with Mr. Leppo, Bancroft made reference to the fact that Heineman had attempted to interpose a higher bid and had been rebuffed. Later in the week, Bancroft received a phone call from Mr. Leo Korbel, husband of another California beneficiary, and Mr. E. Denman McNear, himself a beneficiary. Bancroft learned that Heineman had mailed his letter offer of April 19 to each of the beneficiaries as well as to the trustees. According to

Bancroft's memorandum, his callers expressed satisfaction with the existing agreements with the Pennsylvania and the Santa Fe. They both agreed with him when he said that a "deal was a deal". According to the memorandum, both of these persons knew that the agreements were not binding on the trust estate without Gladson's written consent, which had not as yet been given. It is not clear that they understood that the agreements themselves were conditioned upon aproval by the respective railroads which also had not yet been given. It is clear, however, that neither of these persons was informed by Bancroft that earlier that same morning, April 22, Heineman had "offered" the trustees an amount equal to $133.33 per share of stock.

The meeting of March 15 between Heineman and the interviewers, Bancroft and Kelley, had been a critical one in the efforts of the trustees to sell the TP & W stock. The events that then occurred have already been fully discussed. A second critical meeting, from the viewpoint of this litigation, took place on Friday, April 22, one week after the agreements with the Pennsylvania and the Santa Fe had been signed. Heineman, Judge Morris, and his associate, Mr. Arsht, met with Bancroft and Mr. Edmonds, president of the Trust Company. At this meeting Heineman launched into a chronological review of his prior efforts to purchase the stock. Bancroft agreed that his recounting of events was substantially correct except with regard to the meeting of March 15. Bancroft disputed Heineman's claim that the interviewers had told him they did not want him to name his price. It was Bancroft's belief that Heineman was then asked for his best price. Bancroft also thought Heineman's recollection erred in two other ways. First, Heineman while admitting that a range of prices had been suggested by him did not recall stating, as Bancroft believed he had, that he would not negotiate at the top or bottom of the range. Secondly, Heineman did not mention that at the meeting on March 15 he had discounted the importance of the Monon acquisition. Bancroft wrote in his memorandum, however, that he did not think these omissions or differences of opinion were important.

Heineman then offered to buy the TP &W stock at $12,000,000 for 100% of the outstanding shares, or $133.33 per share, provided

that the trustees could escape their prior agreement. It was evident to Bancroft that Heineman knew that the Pennsylvania and the Santa Fe were the parties to that agreement, but that he did not know whether they had bought or leased the railroad. Bancroft and Edmonds refused to give Heineman any further information about the transaction. To his offer to bid competitively for the stock their answer was "no", in view of the agrements that had already been made. Heineman then attempted to explain his outer-outer belt plan to them with the aid of a map, but, according to Bancroft's memorandum, they had known of the plan "as soon as Mr. Heineman acquired working control of the Monon." Heineman left the meeting making it perfectly clear that he intended to fight the acquisition in the I.C.C. I infer, from the absence of any reference thereto in the memorandum, that they did not advise Heineman that they considered themselves unable to deal with him because of doubts as to his ability to obtain I.C.C. approval of a sale to the M & St. L.

Heineman's offer of $133.33 placed the Trust Company officials in a potentially embarrassing position. It is tacitly conceded, and indeed they were required to know, that the written agreements of April 15 were not legally binding, at least until the Trust Company received Gladson's written consent and the boards of the purchasing railroads voted approval. Up to that time neither of these steps had as yet been taken. The amount of $133.33 was substantially in excess of what they had previously agreed to accept and moreover was offered for all, rather than part, of the shares owned by the trust estate. While Heineman's new offer was neither in writing nor formally authorized by the M & St. L's board, Heineman was in substantially the same position as the representatives of the Pennsylvania and the Santa Fe, prior to approval by their respective boards. The Trust Company officials had no reason to believe that the board of the M & St. L would fail to approve a purchase of the stock at $133.33, and there is no evidence that they ever held any such doubt.

After meeting with Heineman on the morning of April 22, Bancroft received the phone call from Korbel and Denman McNear

which has already been described. No mention was made to them of the discussion with Heineman. I am satisfied, notwithstanding an ambiguity in the record, that the sequence of events was as has been described.

Later that day Bancroft wrote a memorandum entitled "Factors Considered in Connection With The Sale of 52% of The TP & W stock" which set forth the reasons why the Trust Company had carried out the transaction in the manner described. These "reasons" are considered later herein. On that same evening Korbel and Denman McNear called Bancroft again, this time in connection with transfer of the shares to the purchasers. Bancroft did not mention the morning's meeting with Heineman. On April 25, Bancroft spoke on the phone with Gladson, the co-trustee, with regard to the proposed protective provisions to be included in the formal contract with the Pennsylvania and the Santa Fe. Here again, admittedly, no mention was made of the meeting with Heineman on April 22 or of his proposal. This has a pervasive significance because the agreement with Pennsylvania could still have been cancelled by the trustees with legal impunity. On April 27, the board of the Pennsylvania Company formally approved the April 15 agreement with the trustees. By that time the Trust Company had also received Gladson's written consent to the transaction.

The approval of the agreement on April 27 did not bring the activity surrounding the sale of the TP & W stock to a close. Heineman persisted in his efforts to have his offer of $133.33 considered by the trustees and the beneficiaries. At the same time, the Trust Company and the purchasers were attempting to draw up a formal contract which would provide sufficient protection to the minority interest retained by the trustees. On April 29, Gladson wrote to Bancroft:

> "Word has come to me that *Ben Heineman offered $133 per share* for the TP & W stock. It is hard to believe that this is true, but if it is, I am wondering why this offer was not accepted and why I was not consulted.

"It was my understanding that Heineman was likely to withdraw all offers if we could not come to terms promptly and for that reason the sale to the two railroads was to be speeded up because with him out of the market they would not be willing to pay as much for stock as they would if he stayed in."

The response to Gladson's inquiry is contained in a memorandum of Bancroft dated May 2:

"Upon receipt of Mr. Gladson's letter of April 29, which is attached, Mr. Chinn telephoned him to explain that Mr. Heineman had not made an actual offer and if he had it could not have been accepted without Mr. Gladson's approval. As it was, there seemed to be no reason to unnecessarily upset Mr. Gladson in bringing him up-to-date with respect to Mr. Heineman's visit, the alternative of telling him about it at the next railroad meeting appearing more desirable. In his conversation, Mr. Gladson mentioned that Mr. Coulter reported that the California heirs were quite upset about the deal. In a conversation later today with Mr. Coulter, he was asked about this and reported that the California beneficiaries had not been in communication with him either by telephone or by letter for a long time. * * *"

This memorandum amounts to an admission by the Trust Company that the co-trustee was not given the opportunity to discharge his duty with respect to this new and significant development at a time when the trustees could admittedly have withdrawn from the Pennsylvania-Santa Fe deal without legal liability.

On May 5, Heineman formalized his $133.33 per share offer and sent it to the beneficiaries as well as the trustees. The various beneficiaries by way of counsel determined that the April 15 agreements were for various reasons not binding on the parties and urged the commencement of negotiations with Heineman. The impending formal contract consummating the deal with the Pennsylvania and the Santa Fe failed of approval when Gladson refused to sign without receiving advice of counsel.

On May 25, the Trust Company's representatives, Gladson, and Coulter met together in Chicago with their respective attorneys to discuss the situation as it then stood. Coulter stated at that time that he did not believe that M & St. L would have any difficulty in obtaining I.C.C. approval or that the Pennsylvania could, or would, do much to injure the TP & W pending approval of the sale by the I.C.C. In one stroke, the Trust Company claims, the circumstances which had led its officials to deal with the Pennsylvania and the Santa Fe were altered, since great reliance had allegedly been placed on Coulter's opinions in these matters. Of course, had this been a significant factor in the Trust Company's thinking at the time it decided to accept and adhere to the Pennsylvania-Santa Fe deal, it would be most relevant to its defense here. However, for reasons hereinafter given, I conclude that this factor was not believed by the Trust Company at that time to be as significant as is now suggested.

On May 26, counsel for the Trust Company advised Chinn that the April 15 agreements were not legally binding. On the following day the Trust Company agreed that Heineman's offer should be accepted provided that no better offers were forthcoming. Inquiries were directed to Symes and Gurley. Symes refused to pursue the matter any further and stated that the Pennsylvania would stand by its April 15 agreement. Gurley with the approval of the Santa Fe's board offered $135 for all of the stock, and that offer was accepted. On June 28, the Santa Fe agreed to sell one-half the stock it had acquired to the Pennsylvania. This action by the Pennsylvania Company seeking to enforce its agreement of April 15 then followed.

The principal issue is whether the trustees exercised proper care and judgment first in carrying out the transaction of April 15 and then in allowing the agreements signed on that date to stand, notwithstanding the fact that higher offers were subsequently received prior to the time these agreements became even arguably binding on the trust estate. As a result of the trustees' failure to take steps to delay consummation of the transaction, the trust was placed in the

position of having to compromise for $500,000 a claim based on the agreement with Pennsylvania. The beneficiaries here contend that the trust estate was placed in such position by the improper conduct of the Trust Company and therefore should not be made to bear the cost of the settlement.

■ On the record here I am of the opinion first that the Trust Company negotiated the April 15 agreements and thereafter persisted in maintaining them even though it knew that it had not reasonably explored the possibility of obtaining a higher price from Heineman. Whatever doubts may have existed on this score in the minds of the Trust Company's representatives on April 15 were necessarily dispelled by Heineman's offers of April 19 and April 22. At a minimum its representatives possessed sufficient information to require them to explore the possibility of dealing with him.

■■ Moreover, it is clear that until April 27, when the Pennsylvania Company's board voted approval of the April 15 agreement, the trustees were not legally bound to continue with that agreement. Evidently the Trust Company's representatives felt morally bound to continue with the April 15 agreements even though both of these papers expressly provided that they were subject to board approval by the respective railroads. Both Chinn and Bancroft so testified. Nevertheless, a moral commitment, as opposed to a legal one, is generally not a legally sufficient reason for a trustee to neglect his overriding duty to sell at the maximum price. *Buttle v. Saunders,* [1950] 2 *All Eng.L.Rep.* 193. Nor are there special circumstances present here which would compel a different result. Heineman had undoubtedly been a persistent and anxious bidder throughout this entire period, and the other railroads themselves must have known that they had yet to make the April 15 agreements legally binding by their own act. Moreover, the Trust Company's representatives as well as the purchasers knew that the protective provisions deemed necessary by the trustees had not yet been considered by the parties. Under the circumstances, the trustees having learned that better terms of sale were obtainable from Heineman

and having no legal commitment to the other purchasers were bound to explore the possibility of dealing with him.

The Trust Company contends, even conceding the fact that a better price was obtainable from Heineman and that there was no binding commitment to the other purchasers until April 27, that its representatives honestly believed under all the circumstances that selling to Heineman would have been improvident and unwise. Thus, it is argued, the conduct of the Trust Company was fully justified even though the existing agreement of sale at $100.00 per share would not have obtained for the trust estate the highest possible price.

The principal ground for this contention is that the Trust Company's representatives honestly believed from information then available to them that a purchase by Heineman would fail to obtain I.C.C. approval in view of the opposition that would arise from the Pennsylvania and the Santa Fe. The Trust Company claims that its officials feared that during the pendency of the M & St. L's application the opposing railroads would materially injure the TP & W and that once the M & St. L had failed to obtain I.C.C. approval, the trustees would be left with an asset whose value had been impaired and be faced as well with hostile connecting railroads at either end of its line. I think the Trust Company could reasonably anticipate that if the sale to Heineman were blocked by the I.C.C., neither the Pennsylvania nor the Santa Fe would manifest much interest in the further disposition of the TP & W stock. Thus, the Trust Company argues that dealing with Heineman, whether before or after April 15, and at a time when there was considerable apprehension concerning the M & St. L's fate before the I.C.C., could not as a matter of law have been required of its officials.

The Trust Company suggests certain other reasons for the failure of its representatives to attempt to deal further with Heineman after April 15, viz., the personal opposition of both Gladson and Mrs. McNear to Heineman. I am persuaded that neither of these reasons would justify the failure of the Trust Company to take

some action on its own part. With regard to Gladson, the Trust Company could not excuse its own conduct by arguing that it would have deferred to a refusal by its co-trustee to sell to Heineman even though such refusal on his part were improper. As to Mrs. McNear, the Trust Company was not bound under the terms of the trust instrument to consult with her concerning a sale of the stock; in any case she was not authorized to speak for the other beneficiaries. Moreover, the evidence tends to show that she opposed selling the stock to anyone, not just to Heineman. When Mrs. McNear learned, after April 27, of Heineman's $133.33 proposal, she was the one who by her attorneys initiated re-consideration of that offer by the trustees. Thus, I am of the opinion that these "other" reasons offered by the Trust Company to explain its failure to deal with Heineman are without substance.

It is clear then that the Trust Company's case rests at bottom on the contention that its failure to explore the possibility of dealing further with Heineman was justified by the fears of its representatives concerning the I.C.C. The beneficiaries contend that these alleged "fears" were wholly unfounded, that I.C.C. approval of a sale to Heineman could in fact have been obtained, and that the trustees were negligent in failing to make a reasonable investigation to ascertain the facts. This court is of course in no position to determine whether an application for I.C.C. approval by the M & St. L, if it had been the actual purchaser, would have succeeded. The court's concern, therefore, is directed only to the question whether the Trust Company's representatives exercised such care in reaching the conclusion that I.C.C. approval could not be obtained that they are not chargeable with negligence in failing to re-consider the possibility of dealing with Heineman.

The record indicates that the problem of I.C.C. approval was never a material consideration in the minds of the Trust Company's representatives until March 25, 1955. On the previous day Chinn, Bancroft, and Kelley had met with Symes of the Pennsylvania. The latter had indicated forcefully his company's concern about the possible acquisition of the TP & W by Heineman and discussed

the possibility of a sale of the stock jointly to the Pennsylvania and the Santa Fe. On the 25th Bancroft called Coulter to tell him of this conversation. Coulter, as noted earlier, told Bancroft that I.C.C. approval of a sale to Heineman was "by no means assured" and that there might be as much as a year's delay before a decision was handed down. Symes had said, according to Bancroft, "that Pennsylvania would do all they could to prevent such an acquisition which, as we [*i.e.*, the Trust Company's representatives] know from their position on the east end, could be material". After Bancroft's conversation with Coulter various officers of the Trust Company met together to discuss the situation thus created by the Pennsylvania's rather sudden interest in the TP & W. It was thought, according to Bancroft, that "[the] trouble with the M & St. L offer is that if accepted there was no assurance that I.C.C. approval would be received and because of lack of cooperation by the Pennsylvania and Santa Fe, we can end up by having the Railroad and unfriendly railroads at each end of the line." Thereafter, in another conversation with Bancroft, Coulter reported that Mrs. McNear had said she would never approve a sale to Heineman and had threatened to appear before the I.C.C. to prevent the Commission's approval.

The Trust Company's representatives were aware at an early date that under certain circumstances I.C.C. approval would have to be obtained by a purchaser of the stock, but it had never been suggested prior to March 25 that Heineman could not obtain such approval. In December 1954, Heineman had in fact notified Bancroft that he had discussed the possible acquisition of the TP & W with the Commission, although the results of that purported meeting do not appear in the record. It is apparent from this record that the difficulties that were anticipated in obtaining I.C.C. approval arose not so much from the merit or lack of merit of the M & St. L's case, but from the threatened opposition of the Pennsylvania and the Santa Fe before the Commission. There is nothing in this record to suggest the contrary. Moreover, it is clearly established that the interest of the Pennsylvania and the Santa Fe in the TP & W lay principally in defeating Heineman's Monon scheme. If these other railroads were certain that Heineman could not ob-

tain I.C.C. approval, they would hardly have pressed so vigorously for a sale to themselves.

■ As trustee, the Trust Company was obligated to choose impartially among the prospective purchasers in the interest of obtaining the highest return for the trust estate. I am faced then with the question whether the Trust Company's representatives acted with sufficient care in reaching the conclusion that I.C.C. approval was so uncertain that they had no obligation to consider dealing further with Heineman.

What sources of information led the Trust Company to reach its decision concerning the I.C.C.? The Trust Company argues that its representatives relied heavily on the opinions of both Coulter and Gladson and on the "manifest logic" of the situation once they learned of the opposition of the Pennsylvania and the Santa Fe. There is, however, no indication in Bancroft's memoranda, other than the conversation of March 25, that the question of I.C.C. approval was pursued at all by the Trust Company until May 25, 1955. And there is no evidence that any inquiry was ever directed to anyone knowledgeable in such matters or that any investigation was made through persons other than Coulter and possibly Gladson. I infer from the record that the matter was never discussed with Heineman or the beneficiaries, and no effort was made to see whether Heineman would approve an agreement that could have protected the trust estate from the consequences of a failure to obtain I.C.C. approval. In short, the Trust Company's representatives, having obtained a certain opinion concerning I.C.C. approval of a sale to Heineman, made no further effort to test the validity of the conclusions drawn or even to communicate their concern to other interested parties.

Was the nature of the information such that the Trust Company's representatives were justified in following the course of conduct they ultimately adopted with regard to Heineman? The question in effect is whether their decision not to deal with Heineman based solely upon the purported advice of Coulter and Gladson was proper under the circumstances. I note first with respect to Coulter that through May 25 his advice on the subject of I.C.C. approval

apparently was sought only one time. That was the occasion of the March 25 call from Bancroft to Coulter after the interview with Symes. The sum total of the advice given was that I.C.C. approval of a sale to Heineman was "by no means assured" and that a decision thereon might well be delayed. The Trust Company claims in its brief that Gladson had expressed a similar opinion. I find nothing either in the contemporaneous memoranda or in the recorded testimony to indicate that this was so. At best, the testimony tends to show that Gladson had expressed some apprehension about selling to Heineman over the opposition of the Pennsylvania and the Santa Fe. I am not referred to any statement on his part, however, that I.C.C. approval of the M & St. L's application could not be obtained or that such approval was in doubt. There is no indication in the record that the Trust Company's representatives ever asked Gladson to express an opinion on this matter.

Next, the Trust Company points to a memorandum by Bancroft dated April 22, 1955, the same day on which Heineman made his $133.33 offer, and entitled "Factors Considered In Connection With The Sale of 52% of The TP & W Stock":

> "It was apparent that the logical purchasers were the Pennsylvania and Santa Fe Railroads because of their positions at the eastern and western ends of the Railroad and the fact that they were the Railroad's two most important connections. Furthermore, it was definitely indicated that a sale to any other railroad would be strongly opposed before the I.C.C. by the Pennsylvania and Santa Fe and considered opinion was that these roads' opposition would possibly prevail with the Commission. With the two most important connections vigorously opposing sale to another railroad, the TP & W's revenues would undoubtedly suffer and if the sale was not approved by the Commission, the TP & W would be faced with the problem of continuing its operations with two unfriendly roads at its two ends."

> "* * * These offers [by the Pennsylvania and the Santa Fe] were accepted, and the following are some of the important reasons for doing so:

"1. It was felt that these railroads were the logical purchasers even though they were unwilling to purchase the Trustees' entire holding and that a sale to them had the best chance for approval.

"2. An agreement to sell to any other railroad operating in the TP & W area would meet with strong and possibly successful opposition on the part of the Santa Fe and Pennsylvania.

"3. In the meantime the operation of the TP & W could be seriously affected by the loss of the friendly arrangements with these two railroads, from which the TP & W might never recover * * *."

This memorandum in my opinion lends no support to the Trust Company's contention that its agents had reasonable grounds for refusing to deal with Heineman. First, it indicates no further grounds for the Trust Company's conclusion with regard to I.C.C. approval other than those which have already been described. Secondly, it states nothing more definite than that the opposition of the Pennsylvania and the Santa Fe might "possibly prevail" with the Commission, a sentiment which under the circumstances could hardly be treated as more than a truism.

The parties are in dispute as to when the threatened "reprisals" against the TP & W were to take place. Assuming in favor to the Trust Company that these were to occur during the pendency of the M & St. L application, they would be of no concern to the trust estate except in the event final approval was not obtained. Thus, I do not think that the Trust Company's agents can justify their action on this basis.

I start with the proposition that if a sale of all the stock to Heineman were consummated, the trust estate would thereafter have no concern with the continuing operation of the TP & W. At bottom, then, the principal objective of the Trust Company should have been to obtain the highest possible dollar, keeping in mind the likelihood of opposition in the I.C.C. by parties whose interest lay in preventing

completion of such a sale. When that opposition became evident, the Trust Company's representatives were obligated to take reasonable steps to investigate the risks involved in following any one of the available alternatives. And while they could properly seek the advice of others concerning the I.C.C. problem, the final decision in calculating the amount of danger involved in selling to Heineman necessarily rested with them. *Bogert, Trusts and Trustees (2nd ed.)*, § 612, *p. 411 and* § 541, *p. 452; cf. Learoyd v. Whiteley, 1887, 12 A.C. 727.*

 Applying these principles to the present case, I am of the opinion that the Trust Company's representatives did not exercise the diligence or care ordinarily required of a trustee. I am persuaded from the record before me that the question of I.C.C. approval was never considered a serious obstacle to a sale to Heineman except as an afterthought when it became apparent that the trustees had failed to obtain the high dollar for the stock. It was no doubt true that the M & St. L would face strong opposition before the I.C.C. and that in obtaining Coulter's opinion on this matter the Trust Company had the benefit of the advice of a person with wide railroad experience, but I do not think that its representatives devoted much attention to this problem at all during what I consider to be the crucial period in this case.

I do not think that the conduct of the Trust Company's representatives in negotiating the sale, though perhaps understandable, was legally excusable. Taking into consideration the numerous factors that made selling to Heineman unattractive, they might possibly have concluded on April 15 that whatever advantage they might receive in price from him would be more than offset by the cumulative disadvantages. These "disadvantages" were of course the opposition of Gladson and Mrs. McNear to Heineman, the fear on the Trust Company's part of losing its "bird in hand", the assurances given the Pennsylvania and the Santa Fe that the trustees would not haggle, Heineman's threat to pursue his "second choice" by the middle of April, which would have released the pressure on

the other buyers, the prospect of uneasy relations with the TP & W's connecting carriers, and finally the unprobed I.C.C. problem.

The point to be kept in mind is that as of April 15, the trustees were not under any compulsion to investigate the question of I.C.C. approval. Their attention was largely directed to their overriding obligation to obtain the maximum price for the stock. The record I think fairly supports this conclusion. From March 25, when Coulter first suggested that the M & St. L might face difficulties before the I.C.C., until April 22 there was only one reference to the I.C.C. problem. That was Coulter's volunteered statement to Bancroft that Mrs. McNear strongly opposed selling to Heineman and was threatening to appear before the Commission to block any sale to him. Thus, the only information which the Trust Company had concerning the I.C.C. was that approval of the M & St. L was not "assured" because of the likelihood of vigorous opposition by other railroads and possibly by Mrs. McNear. That approval of any railroad by the I.C.C. was not "assured" was of course true, and as Heineman subsequently indicated, he would himself fight to prevent such approval. There is no evidence that the Trust Company's representatives ever weighed the relative prospects of success of the several competing railroads. If I.C.C. approval were thought to be a serious obstacle, one would have expected them to consider the likelihood of Heineman's successfully blocking a sale to Pennsylvania and Santa Fe. The consequences to the trust estate of such action by Heineman would certainly have lessened the potential selling price of the stock. In short, the Trust Company's representatives did not treat the problem of I.C.C. approval as a critical one in determining to sell the stock to the Pennsylvania and Santa Fe on April 15.

Thereafter, the Trust Company's representatives continued to feel no pressing need to investigate the I.C.C. problem even when they received Heineman's offer of April 19, to increase the $100.00 purchase price by five per cent. To a certain extent they may have been lulled by the assurances of certain of the beneficiaries that they were satisfied with the existing deal. They knew that Heineman

had communicated his offer to each of the beneficiaries and that none of these had urged them to re-open negotiations. Furthermore, many of the factors which had previously made a deal with Pennsylvania and Santa Fe seem more attractive than one with Heineman, though at a lower price, still seemed operative. The Trust Company's representatives, however, did not rely on these considerations in refusing to deal further with Heineman. Even though the April 15 agreements could not legally bind the trust estate absent board approval by the respective railroads and written consent by Gladson, the Trust Company treated these agreements as if they were binding, though no legal advice to that effect had been obtained. Thus, the beneficiaries were subsequently informed that "a deal was a deal" and Heineman was told he was "out". This took place before the Pennsylvania board approved the April 15 "deal". Consequently, Heineman received no encouragement to continue bidding for the property notwithstanding his obvious interest, and no effort was made by the Trust Company's representatives to determine critically the possibility of selling to him. There is no suggestion in the record that any reference was made at that time to the purported I.C.C. problem.

Heineman's offer of $133.33 on April 22 created an essentially new situation for the trustees. Assuming without deciding that the Trust Company's representatives exercised reasoned judgment in refusing to consider Heineman's April 19 offer, nevertheless they could not justifiably dismiss Heineman's larger offer without re-examining the factors weighing on either side. Heineman's offer of $133.33 per share, if accepted, would increase the amount per share received by the trust estate by a full one-third, and the Trust Company would be able to dispose of all rather than part of the TP & W stock. The Trust Company's representatives could no longer claim that they had doubts about Heineman's interest in the railroad and were hardly in danger of not being able to sell the stock for at least $100.00. The Trust Company does not contend that it could not have imposed some delay on legal consummation of the April 15 transaction.

When Heineman made his offer of $133.33 on April 22, he was told by the Trust Company's representatives that his proposal could not be considered because "an agreement had been made". No other explanation was given to him. There is no evidence that any further consideration was given to the possibility of selling to Heineman. After the interview with Heineman on April 22, Bancroft wrote the memorandum referred to before. In that memorandum considerable emphasis was given to the I.C.C. problem as a factor in deciding not to sell to Heineman. But this cannot be reconciled with the actions of the Trust Company's representatives in negotiating the April 15 sale and with the explanation they subsequently gave to Heineman and the beneficiaries when they refused to reopen negotiations. Up to April 15, the I.C.C. problem was merely one of the cumulative reasons for preferring a sale to the Pennsylvania and the Santa Fe. If it were in fact a major consideration, the Trust Company's representatives certainly failed to take active steps to assure themselves of the validity of their judgment or to communicate their concern to the other interested parties. After April 15, the only explanation ever given for failing to consider Heineman's new offers was the belief that the April 15 deal was binding. Chinn and Bancroft both testified that they felt committed by the April 15 agreements, and the latter admitted that he had not given much thought to whether the Trust Company could terminate the agreements prior to board approval by the respective railroads or receipt of Gladson's written consent. If the Trust Company's representatives understood that they could withdraw from the April 15 agreements and give further consideration to Heineman's April 22 offer, then they ought reasonably to have investigated the theretofore unprobed I.C.C. problem. That they did not do so perhaps speaks eloquently of the fact that without justification they felt themselves bound by their prior commitment.

That the Trust Company's representatives gave no more consideration to the I.C.C. problem after April 15 than before is substantiated by the April 22 memorandum itself. That memorandum, though written on April 22, makes no reference to Heineman's offers of April 19 and April 22. In other words it was an attempt to

justify, not the continuing refusals to deal with Heineman after April 15, but the April 15 transaction itself. This is consistent with the fact that Bancroft believed at the time he wrote the memorandum that the April 15 transaction was binding on the trust estate and also that the Trust Company's refusals thereafter to deal with Heineman were of no legal consequence. Also, I think it meaningful that Bancroft framed the I.C.C. problem in terms of the "possibly successful" opposition of the Pennsylvania and Santa Fe. If the Trust Company's representatives were seriously giving consideration to the possibility of re-opening negotiations with Heineman in light of his $133.33 offer, they could not reasonably have turned down, on the grounds of "possibly successful" opposition in the I.C.C., this opportunity to increase by one-third the amount per share available to the trust estate unless they had thoroughly studied the matter. Once again, they must have thought that on April 15 and thereafter they had an agreement which made such considerations immaterial.

Another factor leads me to conclude that the Trust Company's representatives did not rely on the I.C.C. problem in deciding not to deal with Heineman. That was their failure to communicate to Gladson or the beneficiaries Heineman's April 22 offer of $133.33. At the meeting of April 22, Heineman proposed a sale of all the stock at $12,000,000 and also offered to enter into competitive bidding, if that were required by him by the trustees. Bancroft wrote in his memorandum of that meeting that "Inasmuch as an agreement had been made, the answer was 'no' ". When Bancroft subsequently talked to Denman McNear and Leo Korbel, no mention was made of Heineman's proposal. The same was true of his telephone conversation with Gladson on the 25th. And when Gladson on the 29th wrote to Bancroft inquiring about Heineman's latest offer which he had learned of indirectly from an unknown source, Chinn called him and said that an "actual offer" had not been made. No mention was made that a sale to Heineman might not receive I.C.C. approval. Moreover, in a memorandum from Bancroft to Gladson dated May 2, the reason for failing to respond both to Heineman's $133.33 offer and also to a new expression of interest from Mr. Mulligan was stated to be the existence of a prior deal.

I am persuaded from these facts that the failure of the Trust Company's representatives to communicate Heineman's proposal to the parties interested in the trust, at a time when they might have taken some action against the April 15 agreements, is explicable only on the mistaken ground that the Trust Company's agents believed those agreements to be binding. I do not think that it can fairly be said that the conduct of these officials at that time derived in any way from a conviction about the I.C.C.. There is certainly no evidence in the record that after April 15 they had given any further consideration to the purported I.C.C. problem.

From the record before me I conclude that the Trust Company's representatives made no reasonable investigation of the alleged I.C.C. problem and relied, if at all, solely on Coulter's stated opinion that I.C.C. approval was "by no means assured". If this were the basis for the Trust Company's refusal to deal with Heineman, I am of the opinion that its agents failed to exercise the required degree of diligence and care in attempting to arrive at a considered judgment as to whether I.C.C. approval could be obtained and in deciding that they were justified in refusing to negotiate with him for a higher price. However, I am convinced that after April 15 the Trust Company's representatives reacted to the agreements as if they were binding although they gave little consideration to the matter and had not obtained the advice of their attorneys. I conclude therefrom that the question of I.C.C. approval played little or no part in their decision not to re-open negotiations with Heineman. The record I think fairly supports the conclusion that they acted on an erroneous assumption concerning the effect of the April 15 agreements, at least prior to their approval by the respective boards, and on that basis deprived the trust estate of the opportunity of freely withdrawing from a "contract" which was less advantageous than that offered by Heineman. In consequence, the Trust Company must be held to have failed to observe the standard of conduct required by the applicable Delaware statute.

The beneficiaries and co-trustee assert as an alternative basis for liability that the Trust Company committed a breach of trust

when its agents failed to notify Gladson of Heineman's $133.33 offer after it was communicated to them and thereby prevented him from exercising an independent judgment in that regard.

I have referred earlier to Heineman's April 22 proposal. The Trust Company makes the contention that that proposal did not constitute a "firm" or "formal" offer. Assuming, without deciding, that such were in fact the case, I think that that would have no bearing on the legal consequences of the Trust Company's actions. I say this because both Chinn and Bancroft concede that they could easily have requested Heineman to satisfy whatever formalities they might have required of him. Instead they told him that an agreement had already been made.

What was the Trust Company's duty under the circumstances when they received a substantially higher bid for the trust property before the existing agreements of sale with the Pennsylvania or Santa Fe became legally binding? Where there are two or more trustees, action by all of them is necessary to the exercise of the powers conferred upon them as trustees. *Restatement (Second), Trusts* § 194. Under the terms of the trust instrument Gladson's written consent was required for a sale of these assets. The Trust Company's representatives apparently had not received such written authority from Gladson at the time of the $133.33 Heineman "offer". Thus, under ordinary principles of trust law, they had a duty to keep Gladson fully informed of any offers or proposals received by them so that both trustees might perform their duties in connection with the sale of the property. See *Loud v. Winchester,* 52 *Mich.* 174, 17 *N.W.* 784. I would add that where a unique asset of the character of this stock was involved, constituting the principal asset of the estate, the Trust Company should have endeavored to keep its co-trustee as fully informed as possible with respect to any information concerning its disposition. Whatever may have been the sentiments of the Trust Company's representatives concerning a possible deal with Heineman, they had no authority to prevent Gladson from exercising his own, independent judgment on the matter. If Gladson had been informed of the offer at any time prior

to the 27th, he might have acted to prevent the agreement with Pennsylvania from maturing to the point where it could be, as it was, seriously contended by Pennsylvania that it was legally binding on the trust estate.

Gladson was not informed of Heineman's April 22 proposal when he spoke to Bancroft on April 25. He only learned of that proposal indirectly and on April 29 wrote a letter to Bancroft to find out why it had not been accepted. Pennsylvania's board had approved the April 15 agreement with the trustees on April 27, but neither Chinn nor Bancroft learned of that vote until May 4. Thus, when Chinn replied to Gladson's letter on May 2, he did not then know that the agreement of the 15th had been approved by the Pennsylvania. The substance of this significant conversation is related in Bancroft's memorandum of May 2:

> "Upon receipt of Mr. Gladson's letter of April 29, which is attached, Mr. Chinn telephoned him to explain that Mr. Heineman had not made an actual offer and if he had it could not have been accepted without Mr. Gladson's approval. As it was, there seemed to be no reason to unnecessarily upset Mr. Gladson in bringing him up-to-date with respect to Mr. Heineman's visit, the alternative of telling him about it at the next railroad meeting appearing more desirable * * *."

Thus, it would appear that Chinn's reply to Gladson, while perhaps technically accurate, failed to convey the really important aspects of the April 22 interview with Heineman. It was designed to avoid "upsetting" him and admittedly was not "up-to-date". Clearly Gladson was not given the information to which he was entitled as co-trustee. *Rockwell v. Dow*, 85 *N.H.* 58, 154 *A.* 229. He thus cannot be deemed in any way to have acquiesced in the Trust Company's decision to refuse to deal with Heineman. When the parties to the April 15 agreements subsequently met on May 4 to execute formal contracts, Gladson refused to sign without the advice of counsel. On May 5, Heineman mailed drafts of his $133.33 offer to both trustees and to the beneficiaries. As a result, the formal con-

tracts embodying the terms of the April 15 agreements were thereafter never executed.

I conclude that as a matter of law, under the circumstances in which Heineman's April 22 offer was received, the Trust Company had a duty to communicate that offer to its co-trustee and that having deprived Gladson of an opportunity to save the trust estate from a loss occasioned by its delay in withdrawing from the April 15 agreements, it must bear the cost of such action on its part. This, then, is a second and independent basis for concluding that the Trust Company must be held responsible.

Finally, the Trust Company has urged that the beneficiaries are estopped to complain of the position taken by its representatives with respect to the April 15 transaction. Having reviewed the evidence I find that at least with regard to Heineman's $133.33 offer the beneficiaries had no information at all until after April 27. When they learned of Heineman's proposal, they recommended through their attorneys that that offer be given due consideration by the trustees. By that time, however, the trustees were no longer free to resist the claim of the Pennsylvania Company without possible legal liability. Thus, there is in this regard no substance to a claim of estoppel. The Trust Company must bear the burden of a surcharge in an appropriate amount because of its failure to act at an earlier time when it could admittedly have escaped any claim of liability by Pennsylvania based on the April 15 agreements.

Present order on notice.