IN THE MATTER OF First Account of Equitable Trust Company, Succeeding Trustee under the Will of Annie Mills, deceased.

*Kent, May 15, 1942.*

*Caleb R. Layton, 3rd,* of the firm of Hastings, Stockly & Layton, for exceptant.

*Caleb S. Layton,* of the firm of Richards, Layton & Finger, for trustee.

THE VICE-CHANCELLOR: The exceptions call in question a sale by the trustee of a tract of about three acres of unimproved land located in Clayton, Delaware. The exceptant charges that by this sale the trustee violated its duty in that the price received was inadequate, and in that the trustee failed to offer the property at public sale or with notice to the public or the beneficiaries of the trust, and failed to reinvestigate the value of the land before selling to a person whose services it had solicited to effect a sale.

Annie Mills died in 1922. By her will she gave property, including the land in Clayton, to Jeanette L. Barkley, in trust. At the death of Mrs. Barkley in 1935, Equitable Trust Company succeeded as trustee, pursuant to the provisions of the will.

In August 1936, the trustee applied to one Slaughter to find a purchaser for the property. Slaughter was an active businessman in Clayton. He was an auctioneer, a dealer in building materials, and had bought and sold real estate on numerous occasions. He was recommended to the trustee by one of its employees, as the most likely person to bring about a sale. There was no licensed real estate broker in Clayton. Slaughter informed the trustee that real estate prices were low and that there was no activity in sales of land. He mentioned instances of properties sold or offered for sale at what appear to be very low prices. A year later, in July 1937, the trustee again wrote Slaughter inquiring whether the land could be sold at private sale or public auction. Slaughter recommended against a public sale. He reported that he had tried to interest several people, without success. In the fall of 1937, the trustee made inquiries of a banker in Smyrna, who was known to it, concerning a sale of the land. This banker wrote the trustee to the effect that the property might in time become of value, but that there was no immediate chance for this, and little likelihood of securing higher prices "by holding for a real estate boom." In January 1938, the trustee once

more communicated with Slaughter about a sale of the tract. On February 23, 1938, Slaughter wrote the trustee that he had succeeded in selling it for $500. He later designated a certain corporation as the purchaser. In fact, Slaughter owned a controlling interest in the corporation, although it does not appear that the trustee was then aware of this. Shortly thereafter, Slaughter notified the trustee that he would take title to the land in his own name and would waive any commissions upon the sale. The trustee made no further investigation but conveyed the tract to him by deed dated March 31, 1938.

The exceptant says that the sale price was grossly inadequate. He contends that the trustee twice recognized and represented that the land had a substantially greater value; in stating its account, the trustee charged itself with the land as a debit item of $1,300; again, in the 1938 annual return to the Board of Assessment of Kent County, pursuant to *Revised Code of Delaware* (1935) *Section* 1306, an officer of the trustee certified that the land had a value of $1,000. As to the first point, a statement in the account makes plain that the trustee charged itself with the principal received, including the land, "as shown by" the account of the predecessor trustee. Thus, it merely adopted the debit items in the amounts set forth in the account filed on behalf of its predecessor. The method of accounting thus followed does not purport to be, and should not be treated as, a representation or acceptance of the stated amounts as the actual value of the property. As to the second point, the officer of the trustee corporation who signed the annual return testified that he believed, at the time, that $1,000 was the fair value for tax purposes, but that he had made no examination of the property to determine its value. From the testimony it is apparent that his statement of value was made more as an approximation than as an appraisal arrived at after serious deliberation and consideration of the factors of value. Such a statement should be accorded little, if

any, weight for the present purpose of deciding the question of value with some degree of particularity and accuracy.

The exceptant urges that his contention as to value is supported by the assessed valuation for real estate taxes and by the testimony of two witnesses whom he called. For a number of years prior to the sale, the property was assessed for county taxes at the value of $1,500, and for town taxes at the value of $1,800. Exceptant points out that pursuant to *Section* 1294 *of the Revised Code,* the Kent County Board of Assessment is required to assess property "at its true value in money." An attorney who had resided for years in Clayton and who had attended many real estate settlements, testified that in 1935 or 1936, at the request of an officer of the bank, he gave an oral opinion that the land was worth $2,500, and that none of the seventeen lots into which it was divisible should sell for less than $100. Another witness for the exceptant testified that in 1937 he had purchased a tract somewhat smaller than the Mills tract for $1,500, and that this property is on the east side of Clayton, which is less desirable for residential purposes than the west side where the Mills property is located.

Prior to the sale by the trustee, the land was vacant, unimproved, and at times grown up in weeds. Part of it was low, and there water accumulated and laid after heavy rains. Trash and refuse were occasionally dumped on the land. The plot of the town of Clayton showed a street, Washington Avenue, traversing the tract. This street, where it passed through the tract, was ungraded and unsurfaced and, although passable, was only infrequently used. On three sides of the tract were sections in which were erected some residences. Across a road which bounds the fourth side was property of St. Joseph's Industrial School for Colored Boys. Barns belonging to this charitable institution were immediately opposite. Since 1923, the land had produced no income, except the sum of fourteen dollars. It was, however, subject to town and county taxes.

There is no evidence that either the original or the successor trustee received an offer to purchase or rent the land from 1923 to 1938, until Slaughter made his offer. Land other than the Mills tract was available for development for residences. During the period mentioned, there was but one house constructed in Clayton. Several improved properties were sold, and the sale prices were uniformly low, some less than $1,000. There was no industrial or other activity in or near Clayton making probable an increased demand for residential property. Slaughter as well as a local banker testified that in their opinion the land was not worth in excess of $500 or $600 at the time of the sale, and that it could not have been sold to advantage at public sale.

The tax assessment values and the testimony that the tract was worth $2,500 are inconsistent with the evidence of prices received at actual sales of real property in Clayton during a long period prior to the conveyance to Slaughter. Other than that they represent opinions of value, I find nothing to support them. On the other hand, the sale price of the Mills tract seems in harmony with the prices at which improved properties were sold. The parcel on the east side of Clayton, which was sold for $1,500, had erected on it a frame dwelling which, although in poor condition, was habitable and was rented for ten dollars per month. In face of the evidence of the condition of the Mills tract and the general real estate market condition in Clayton, it seems to me that exceptant's points now under consideration fall short of establishing that the price received by the trustee was inadequate.

It is also contended that the prices at which Slaughter resold parts of the tract show that its value was greater than what he paid for it. Within a few days after the conveyance to him, he began selling the property in lots. The proofs show that he gave away one, traded another, and at the time of the hearing had disposed of thirteen, leaving but four lots remaining. For most of the lots sold,

Slaughter received $150 each. The highest sale price of any lot was $250. Based upon the price received for six of the lots (the evidence being somewhat indefinite as to the consideration for the others), the exceptant arrives at the figure of $178.33 as the average sale price.

The circumstance that Slaughter almost immediately resold some of the lots at prices substantially greater than the amount of the purchase price allocable to them would go far towards sustaining the exceptant's contention, unless it be found that the difference is attributable to new factors which came into operation. In this connection, it appears that as soon as Slaughter purchased the land he began improving it and actively promoting what may be called a residential real estate development of the tract. These activities were being carried on while he was selling the lots, and were not completed until after he had disposed of a number of them. A survey was made for the town at Slaughter's instigation. This was begun after Slaughter had agreed to buy the land, but before the deed was executed. In a plot of the tract, it is divided into fifteen lots having a frontage of fifty feet on Washington Avenue, and two irregular lots. Slaughter named the development "Evergreen Gardens", that being a name chosen by ladies of the town. Slaughter expended at least $200 for grading; $100 for removing a hedge; $455 for equipment and installation of electric lights, out of which sum the town reimbursed him in an amount not exceeding $175; $60 for the erection of pillars at an entrance to the property; and $30 for a survey.

Slaughter negotiated with the town council for improvements to be made by the municipality. In the summer of 1938, the town of Clayton graded and surfaced that portion of Washington Avenue which passes through the Mills tract. It installed a water main and sewer, laid concrete sidewalks, curbs and gutters, and expended in all the sum of $1,685.29. Much of the labor for this work was supplied by the Work Projects Administration at a cost to it of $1,026.27. Slaugh-

ter and the persons to whom he had sold lots along the street received the benefit of these expenditures without cost to them, except that they were assessed one dollar per front foot on Washington Avenue for the sidewalks, curbs and gutters. When the assessment was made, Slaughter still owned lots having a frontage of about 537 feet, so that the assessment against him was approximately $537. The payment of this sum by Slaughter was, of course, in addition to the other expenditures made by him which have been previously noted.

The exceptant would minimize the importance of the improvements made by the town as accounting for Slaughter's apparent profit upon selling the lots. He contends and, indeed, there is testimony that upon the application of two or more owners of houses along an unimproved street, the town was obliged to surface the street, and to install a sewer, water main and equipment for electric lighting. The obligation apparently arises from a provision of the town charter, 41 *Laws of Delaware*, (1937) *Chap.* 138, § 29, *p.* 344 *et seq.* The exceptant concludes that any value which the improvements brought to the land was a value inherent in the land before the improvements were made, because of the pre-existing duty of the town to make them when requested. Manifestly, to impel the town to act, it was at least necessary that there be two or more houses on the street, and that the town have funds available to defray the costs,—not to mention the initiative and energy required on the part of some one interested in obtaining the improvements. In his argument, the exceptant loses sight of the difference between probability and actuality of realization.

To sell the land profitably in building lots required skill, industry, the investment of money, and the willingness to risk failure of the venture. This was not, under the circumstances, a proper undertaking for the trustee. It is unlikely that anyone would have bought the land for the purpose of developing it, without the prospect of reward

and profit commensurate with his investment, effort to be put forth, and risks to be run. Slaughter was in a situation which made the successful development of the land particularly advantageous to him. Since he was a dealer in building materials, he could hope for a profit from the sale of materials for improvements of the street, and for the construction of houses, as well as upon resale of the land in lots. It is by no means indicated from the evidence that the success of the venture was certain. The situation must be viewed "in the light of contemporaneous circumstances, and not in the light of subsequent events." *In re Estate of William H. Cook, Deceased,* 20 *Del. Ch.* 123, 171 *A.* 730, 731.

Assuming that the average sale price of each lot sold was $178.33, the amount computed by the exceptant, and assuming that Slaughter received equivalent consideration for lots disposed of other than by sale, and that he will hereafter dispose of the remaining lots at the same price, the result will be that from an investment of more than $1,700 in cash, plus the skill and energy which he has applied, he will at some future day have gotten back a total sum of about $3,000. Under all of the facts, the possible profit is not shocking. It is, on the contrary, reasonable to attribute a large part of such profit to what Slaughter did to promote the development. In any event, the situation was so altered by his activities that it would be unfair to hold that the resale price of the lots establishes inadequacy of the consideration received by the trustee for the entire tract.

The exceptant objects that the land was not sold at public sale. The trustee was specifically authorized to sell the trust property at public or private sale. Thus, the trustee merely exercised its discretion as it was empowered to do.

The exceptant urges that the trustee should have investigated the situation anew when it learned that Slaughter was purchasing the land for himself. The lapse of time between the occasions when the trustee communicated with Slaughter in its endeavor to sell the land, and the fact that

it was the trustee who twice renewed the negotiations with him would tend to negative any suspicion that he had engaged in a scheme to acquire the property for less than its value. Although the trustee relied principally upon Slaughter's advice with respect to a sale, it had also sought information from a banker in Smyrna. It cannot be denied that Slaughter's letter of February 23, 1938, contains statements apparently designed to cause the trustee to believe that the purchaser was an independent third party, where as in truth, Slaughter then intended that the corporation which he controlled should acquire the land. However, before the property was conveyed, Slaughter disclosed his interest and if the trustee had then made an investigation, it does not appear that it would have discovered facts indicating that the property had a value greater than the price actually received.

The exceptant charges that the trustee violated its duty in selling the land to Slaughter under the circumstances present, without public notice or notice to the beneficiaries. Where, as here, the power of sale is broad and its exercise is not conditioned upon the giving of notice, a duty to do so will not readily be inferred; and in general, failure to consult the beneficiaries before selling property, where not required by the trust instrument, does not constitute a breach of trust. *Loud v. St. Louis Union Trust Company*, 313 *Mo.* 552, 281 *S. W.* 744; 65 *C. J. p.* 757. The trustee derived neither direct nor indirect personal benefit from the sale to Slaughter. For reasons previously stated, a finding of inadequacy of consideration is in my view unwarranted. Consequently, the objection as to want of notice must fail.

The conclusion is that the exceptant's contentions, considered separately or together, do not show a breach of trust.

An order overruling the exceptions will be advised.